Filed 6/15/16  Certified for partial pub. 7/13/16 (order attached); reposted to provide corrected publication information

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

JOSHUA TREE DOWNTOWN
BUSINESS ALLIANCE,

      Plaintiff and Appellant,

v.

COUNTY OF SAN BERNARDINO,

      Defendant and Respondent;

DYNAMIC DEVELOPMENT, LLC,

      Real Party in Interest and Appellant.

E062479

(Super.Ct.No. CIVDS1307794)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Donald R. Alvarez, Judge.  Reversed.

Gresham, Savage, Nolan & Tilden, John C. Nolan, and Jonathan E. Shardlow for Real Party in Interest and Appellant.

Law Office of Babak Naficy and Babak Naficy for Plaintiff and Appellant.

1

Bart W. Brizzee, Principal Assistant County Counsel, for Defendant and Respondent.

Dynamic Development, LLC (Dynamic) sought to build a new retail store (Project) in Joshua Tree. Residents of Joshua Tree vociferously opposed the Project. They argued that it would clash with the town's artistic, independent, and rural character; they also argued that it would cause various adverse environmental impacts, including urban decay. Nevertheless, the County of San Bernardino (County) found that an environmental impact report (EIR) was not required and approved the Project.

The Joshua Tree Downtown Business Alliance (Alliance) then filed this mandate proceeding challenging the County's approval of the Project. The Alliance contended that:

1. The County did not adequately consider whether the Project had the potential to cause urban decay.

2. An EIR was required because there was substantial evidence to support a fair argument that the Project could cause urban decay.

3. The County improperly attempted to conceal the fact that the intended occupant of the store was Dollar General, a national retail chain.

4. The project was inconsistent with the Joshua Tree Community Plan (Community Plan), which favors small, independent businesses.

The trial court agreed there was substantial evidence to support a fair argument that the Project could cause urban decay; it therefore issued a writ of mandate directing

2

the County to set aside its approval of the Project. Dynamic has appealed. The Alliance has cross-appealed, arguing that the trial court erred by rejecting its other contentions.

We will hold that the Alliance failed to establish any grounds for a writ of mandate. Accordingly, we will reverse.

I

FACTUAL BACKGROUND

Dynamic proposes to build a 9,100 square foot general retail store, with associated improvements such as parking and landscaping, on a 1.45 acre lot in Joshua Tree. In August 2011, it applied for a minor use permit for the Project. The intended occupant of the store was Dollar General.

The County solicited and received comments from owners of nearby properties. These were overwhelmingly negative. A common theme was that the Project would be "out of character and scale with the small business rural desert family-owned [and] operated business community in Joshua Tree."

In November 2011, at a community meeting, Dynamic, along with Dollar General, gave a presentation regarding the Project. This triggered additional public comments.

In August 2012, the County circulated an initial study and a proposed negative declaration. Based in part on the comments it received, the County decided to revise the initial study and the proposed negative declaration. Among other things, it determined that a conditional use permit (CUP), rather than a minor use permit, was required. It also changed its environmental determination from a negative declaration to a mitigated

3

negative declaration. The revised initial study and mitigated negative declaration were recirculated in November 2012. This produced still more public comments.

In connection with the upcoming public hearing, a County staff report recommended adoption of the mitigated negative declaration and approval of the CUP. The staff report also provided responses to the public comments on the revised initial study.

On January 17, 2013, after a public hearing, the County Planning Commission approved the CUP; it found that the Project did not have the potential to cause significant adverse environmental impacts. It also specifically found that the Project was consistent with the Community Plan.

The Alliance and others appealed to the County Board of Supervisors. In connection with the appeal, yet more comments were submitted. On June 4, 2013, after a public hearing, the County Board of Supervisors denied the appeal and upheld the approval of the CUP.

## II

## PROCEDURAL BACKGROUND

The Alliance filed a petition for a writ of administrative mandate. It alleged, among other things, that the County violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) by failing to analyze the Project's potential for causing "urban decay and blight" and by failing to prepare an EIR despite substantial evidence to support a fair argument that the project could cause urban decay.

4

It also alleged that the County had "deceptively" described the Project as a general retail store rather than specifically as a dollar store. It further alleged that the Project was inconsistent with the Community Plan.

After considering the parties' briefing and argument, the trial court issued an extensive written ruling. It determined that the County did not fail to consider the possibility of urban decay. However, the County did err by concluding that an EIR was not required; the trial court found substantial evidence to support a fair argument that the Project could cause significant urban decay. Next, it determined that the project description was adequate, even though it described the project as a general retail store rather than as a Dollar General store. Finally, it rejected the Alliance's contention that the Project was inconsistent with the Community Plan.

The trial court therefore entered judgment in favor of the Alliance. It issued a writ of mandate directing the County to set aside its approval of the Project and not to approve the Project without an EIR. Dynamic appealed and the Alliance cross-appealed.

III

EVIDENCE THAT THE PROJECT COULD CAUSE URBAN DECAY

The Alliance contends that the County did not adequately consider the possibility of urban decay, and the trial court erred by ruling otherwise. Conversely, Dynamic contends that the trial court erred by ruling that there was substantial evidence to support a fair argument that the Project could cause significant urban decay.

5

A.      *General CEQA Principles.*

"The fundamental purpose of CEQA is to ensure 'that environmental considerations play a significant role in governmental decision-making' [citation]." (*Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 797.)

"CEQA review procedures can be viewed as a '"three-tiered process."' [Citation.] The first tier requires an agency to conduct a preliminary review to determine whether CEQA applies to a proposed project. [Citation.] If CEQA applies, the agency must proceed to the second tier of the process by conducting an initial study of the project. [Citation.] Among the purposes of the initial study is to help 'to inform the choice between a negative declaration and an environmental impact report (EIR).' [Citation.] If there is 'no substantial evidence that the project or any of its aspects may cause a significant effect on the environment,' the agency prepares a negative declaration. [Citation.] Alternatively, if '"the initial study identifies potential significant effects on the environment but revisions in the project plans 'would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur' and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used."' [Citation.] Finally, if the initial study uncovers 'substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment' [citation], the agency must proceed to the third tier of the review process and prepare a

full EIR (environmental impact report). [Citation.]" (*Save Our Big Trees v. City of Santa Cruz* (2015) 241 Cal.App.4th 694, 704-705.)

"In reviewing the adoption of a[ negative declaration], our task is to determine whether there is substantial evidence in the record supporting a fair argument that the Project will significantly impact the environment; if there is, it was an abuse of discretion not to require an EIR. [Citation.] '"Whether a fair argument can be made is to be determined by examining the entire record."' [Citation.]" (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 731.) "Although our review is de novo and nondeferential, we must give the lead agency the benefit of the doubt on any legitimate, disputed issues of credibility. [Citation.]" (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 331.)

"An EIR is to disclose and analyze the direct and the reasonably foreseeable indirect *environmental* impacts of a proposed project if they are significant. [Citations.] Economic and social impacts of proposed projects, therefore, are outside CEQA's purview. When there is evidence, however, that economic and social effects caused by a project . . . could result in a reasonably foreseeable indirect environmental impact, such as urban decay or deterioration, then the CEQA lead agency is obligated to assess this indirect environmental impact. [Citations.] An impact 'which is speculative or unlikely to occur is not reasonably foreseeable.' [Citation.]" (*Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1182.)

"[C]ourts have recognized that CEQA is not a weapon to be deployed against all possible development ills. For example, although CEQA requires public agencies to evaluate the possible negative environmental effects of constructing big-box retail stores (e.g., air pollution from traffic, noise and light pollution, destruction of open space), the fact that they may drive smaller retailers out of business is not an effect covered by CEQA. [Citation.] Only if the loss of businesses affects the physical environment — for example, by causing or increasing urban decay — will CEQA be engaged. [Citations.]" (*South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1614.)

CEQA does not define urban decay. The County, however, used the following definition: "[U]rban decay is defined as, among other characteristics, visible symptoms of physical deterioration that invite vandalism, loitering, and graffiti that is caused by a downward spiral of business closures and multiple long term vacancies. This physical deterioration to properties or structures is so prevalent, substantial, and lasting for a significant period of time that it impairs the proper utilization of the properties and structures, or the health, safety, and welfare of the surrounding community. The manifestations of urban decay include such visible conditions as plywood-boarded doors and windows, parked trucks and long term unauthorized use of the properties and parking lots, extensive gang and other graffiti and offensive words painted on buildings, dumping of refuse on site, overturned dumpsters, broken parking barriers, broken glass littering the site, dead trees and shrubbery together with weeds, lack of building maintenance,

8

abandonment of multiple buildings, homeless encampments, and unsightly and dilapidated fencing."

The Alliance accepts and endorses this definition. Moreover, this definition is consistent with the law that urban decay requires a significant effect on the physical environment.

B.    *Additional Factual Background*.

The following comments relevant to urban decay were made during the various stages of the environmental review process.

1.    *Comments after the November 2011 community meeting*.

Commenter Jonathan Ball stated: "A [Dollar General store] will bring more detriment to the economic viability of other privately owned establishments in that an imbalance toward business competition will not be supported by the small population of the area. A lack of consumer base for existing businesses will be realized in the closure of existing shops and a decline in local debt payments once existing stores are not able to clear their overhead. An additional general store will spread the consumer field thinner than it already is and create market strains on established businesses not likely to be endured through the coming economic downturn."

Commenter Mark Cranston owned a vacation rental company and a trucking company. He asked rhetorically: "How many more businesses have to be shut down before we understand that businesses like . . . Dollar General will not support the local economy and bring nothing that we don't already have? How many times do we have to

see a big box store come into a small community [and] force other businesses into bankruptcy to only fail as well?"

> 2. *Comments on the November 2012 revised initial study and the County's responses.*

The revised initial study did not specifically discuss urban decay. Several commenters, including Kerri N. Tuttle, pointed this out. Tuttle asserted that, under two specified court decisions, "CEQA review must assess the possibility of urban decay . . . resulting from the economic impacts of the project."

County staff responded: "[T]he Commenters have provided no evidence to suggest that the Project will contribute to or cause urban decay. There is no factual evidence that development of the subject site with a small retail store would result in the closing of business, resulting in urban decay. The two court decisions referenced by the Commenter were in regard to . . . 'big-box' stores and other large retail projects. The proposed Project . . . is not of the size, scope, and scale of . . . 'big-box' retail stores; so to compare the economic impact of the Project to the impacts associated with a 'big-box' retail store that can be as large as 150,000 square feet plus i[s] not an accurate comparison."

County staff also reported that there was no evidence that the Project would have a negative economic effect.

3. *Comments in connection with the January 2013 Planning Commission hearing.*

According to commenter Julia G. Buckley: "Studies show that when formula retail puts local stores out of business, blight and urban decay ensue."

4. *Comments in connection with the Alliance's appeal.*

Commenter Celeste Doyle identified herself as follows: "I am a member of the . . . Alliance . . . . I am a 12-year resident of Joshua Tree, and a business owner.[1] I was involved in the . . . Community Plan process and I sat on the Citizen Committee appointed by the County to finalize that Plan. Before moving to Joshua Tree, I worked for several years as an Assistant Attorney General in the Oregon Department of Justice, providing General Counsel services to the state's Land Use, Transportation, and other agencies."

Doyle listed several local businesses, including Sam's Market, that had recently made substantial investments in their premises. She then stated: "A low-end retail store in Joshua Tree will not add jobs or sales tax revenues, and may lead to urban blight in our small downtown district.

"A generic, corporate-owned, low-end retail store in Joshua Tree will not 'encourage and support small independent businesses,' but rather will take business away from Sam's Market, our local, independent grocery store, the JT Trading Post and Mike's

---

[1] At a previous public hearing, Doyle had stated that she owned a "small retail store" that sold camping gear and outdoor clothing and rented camping equipment.

11

Liquor Store, all of which already sell much of what the applicant says the likely tenant will have to offer. The proposed project will also likely affect our three non-profit thrift stores, which benefit the Morongo Hospice, needy and homeless women and children, and the local public hospital.

"A Dollar General store will . . . take sales away from existing, locally-owned businesses and our non-profit [t]hrift stores. This shift will lead some of these local stores and businesses to close: They will no longer pay sales taxes, they will lay-off their employees, and they will empty their buildings. Net retail sales in Joshua Tree will not increase and the net number of jobs in Joshua Tree will not increase, but the number of empty storefronts likely will increase.

" . . . Furthermore, the closed storefronts will likely stand empty for a very long time, degrading the town's appearance and vitality, inviting vandalism and leading to urban blight."

Finally, she asserted: "Joshua Tree residents can already purchase much of what the proposed retail store will offer in local markets. What can't be found in Joshua Tree can be found only 4 miles away on Highway 62 in Yucca Valley. Just a five-minute drive, or a ten-minute bus-ride, gets Joshua Tree residents to the intersection of Hwy 62 and Balsa Ave, where they routinely shop at a large grocery store (Stater Brothers), a Walmart, a Walgreens[,] and a Dollar Tree [s]tore, as well as a J.C. Penn[e]y and several

smaller retailers.  Only another mile down the road, and a few bus stops away, is a large, new Rite-Aid, a Vons [s]upermarket and other retailers."  (Fn. omitted.)[2]

C.      *Failure to Consider Urban Decay*.

1.      *The trial court's ruling*.

The trial court ruled that the County did not "fail[] to consider whether economic impacts would result in urban decay.  The County's conclusion was that the Project would not have a negative economic impact on the environment and it flows from such conclusion that urban decay would not result."

2.      *Discussion*.

"[T]he failure of an initial study to disclose the evidence supporting particular findings [is not] necessarily . . . fatal to the resulting negative declaration.  There is 'no authority . . . that an initial study is inadequate unless it amounts to a full-blown EIR based on expert studies of all potential environmental impacts.  If this were true, the Legislature would not have provided in CEQA for negative declarations.'  [Citation.]" (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1378, fn. omitted.)  "[T]he ultimate issue is not the validity of the initial study, but rather the validity of the lead agency's adoption of a negative declaration."  (*Id*. at p. 1379.)

"In examining the record for . . . substantial evidence, the courts recognize the public agency's responsibility for creating an adequate record.  Deficiencies in the record

----

**2**      Doyle had also made some of the same points earlier, in comments on the November 2012 revised initial study.

due to the public agency's lack of investigation 'may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences.' [Citation.] However, it remains the appellant's burden to demonstrate by citation to the record the existence of substantial evidence supporting a fair argument of significant environmental impact. [Citation.]" (*Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1348-1349.) "'An absence of evidence in the record on a particular issue does not automatically invalidate a negative declaration. "The lack of study is hardly evidence that there *will* be a significant impact."' [Citation.]" (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1379.)

Here, as the trial court ruled, the County did consider urban decay; it simply concluded that there was no evidence that the Project would have a negative economic impact, and therefore no evidence that it would cause urban decay.

The County staff report stated: "[E]conomic impacts and urban decay are not among the categories listed within the CEQA Guidelines Appendix G checklist.[3] Thus, in the absence of any other significant impacts, there are no impacts to be 'traced' through a causal relationship to economic changes. [Mitigated negative declarations] may not be prepared for projects with impacts that cannot be mitigated to below a level of

---

**3** "CEQA Guidelines Appendix G provides an environmental impact checklist form that lead agencies may use in preparing an initial study when deciding whether to adopt a negative declaration or prepare an EIR for a project. [Citation.]" (1 Kostka & Zischke, Practice under the Cal. Environmental Quality Act (2d ed. 2015) § 13.15, p. 13-15.)

14

significance; this is why economic impact analyses are sometimes seen within EIRs, but not within [mitigated negative declarations]."

The Alliance takes this to mean that the County refused to consider the possibility of urban decay solely because Appendix G to the Guidelines did not include a checkbox for it. The County's statement, taken as a whole, however, means that economic impacts, standing alone, are not sufficient to require an EIR, and hence are not reflected in Appendix G; they may require an EIR only if they cause other significant impacts, which *would* be reflected in Appendix G. This is consistent with the law, as discussed in part III.B, *ante*.

The Alliance responds that "Appendix G is only an illustrative checklist, not an exhaustive list of all potentially significant environmental impacts under CEQA." (See 1 Kostka & Zischke, *supra*, § 13.15, p. 13-16.) Nevertheless, it does include the broad catchall question, "Does the project have environmental effects which will cause substantial adverse effects on human beings, either directly or indirectly?" Thus, the County was correct in concluding that, if the answer to that question was "no," then the mere fact that the Project might have economic impacts did not require an EIR.

The Alliance also claims that the County refused to consider the possibility of urban decay because it reasoned — incorrectly, in the Alliance's view — that the Project was not a "big box" store and that only a "big box" store could cause urban decay. Actually, the County staff report stated: "Based on staff's experience and research, the Project is not a 'Big Box' retailer, *and no evidence exists otherwise* to suggest that the

15

development will have a negative economic effect on the community." (Italics added.) Thus, while the County properly considered the fact that the Project was not a "big box" store, that was not the end of its analysis.

In sum, then, the County did not fail to consider urban decay; it did consider it, but it concluded that there was no evidence that the Project would cause either negative economic impacts or urban decay. We proceed to review this finding.

D. *Evidence Regarding Urban Decay*.

1. *The trial court's ruling*.

The trial court cited, discussed, and relied on Doyle's comments. It concluded: "Given Ms. Doyle's community involvement and knowledge of the downtown business community, the cited discussion about local businesses, the amount of money invested in such businesses, and the surrounding business community presents substantial evidence in the form of facts and reasonable assumptions predicated upon such facts to support a fair argument that the Project may have a significant environmental effect in the form of urban decay. She discusses that general retail needs are being met by existing local retail stores and nearby larger stores. Therefore, this retail sales store will take sales away from existing businesses. A statement regarding downtown store closures is based on this business owner's knowledge of the downtown market and existing demand. In addition, given the level of investment discussed, a reasonable assumption could be made that if these businesses close, they will cause long-term vacancies of retail space resulting in degradation of the town's appearance and blight, which would support a conclusion of a

16

physical deterioration.  While Ms. Doyle may not be an expert in a traditional sense, her experience and observations regarding the local business community and retail markets demonstrate[] sufficient relevant personal observations that consist[] of facts and reasonable assumptions predicated upon such facts."

> 2.    *Opinion evidence under CEQA*.

"Under CEQA, 'substantial evidence' is 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'  [Citation.] . . . Substantial evidence includes facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts.  [Citations.]  It does not include '[a]rgument, speculation, unsubstantiated opinion or narrative, [or] evidence which is clearly inaccurate or erroneous . . . .'  [Citations.]"  (*North Coast Rivers Alliance v. Kawamura* (2015) 243 Cal.App.4th 647.)  "Complaints, fears, and suspicions about a project's potential environmental impact likewise do not constitute substantial evidence. [Citations.]"  (1 Kostka & Zischke, *supra*, § 6.42, pp. 6-47-6-48.)

"Members of the public may . . . provide opinion evidence where special expertise is not required.  [Citations.]"  (1 Kostka & Zischke, *supra*, § 6.42, p. 6-46.2.)  However, "[i]nterpretation of technical or scientific information requires an expert evaluation. Testimony by members of the public on such issues does not qualify as substantial evidence.  [Citations.]"  (*Id*. at p. 6-47.)  "[I]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do

17

not constitute substantial evidence.  [Citations.]" (*Gentry v. City of Murrieta*, *supra*, 36 Cal.App.4th at p. 1417.)

Here, Doyle was not an expert in any relevant area.  Indeed, the trial court acknowledged this (in a backhanded way) by conceding that she "may not be an expert in a traditional sense . . . ."  She was a business owner and a lawyer.  She was not an economist; she did not claim so much as an MBA.  Thus, she was not qualified to opine on whether the Project would cause urban decay.  In addition, she did not offer any particular factual basis for her opinions.  She did not claim that her business or any other business in Joshua Tree had ever actually suffered from competition with a national chain; she had not taken any surveys or done any studies.  Thus, whether viewed as lay or expert opinions, her conclusions were speculative.

It might seem to be only a matter of common sense that a new store would reduce the sales of nearby stores selling similar goods.  However, it is also possible that a new store would draw more shoppers into the area, and that some of them would make a purchase at an established local store — either instead of or in addition to a purchase at a Dollar General.  There are sound reasons why otherwise competing businesses would choose to locate near each other.  (See K. Steif, Why Do Certain Retail Stores Cluster Together? <http://www.planetizen.com/node/65765>, as of Apr. 4, 2016.)

Even more important, the mere fact that a new store might cannibalize part of other stores' sales does not mean that urban decay would result.  Common sense alone tells us nothing about the *magnitude* of this effect.  The other stores might be able to

continue in business. If worse came to worst and they went out of business, a more efficiently run store of the same type or a different type of store might move in. The property might be turned to an entirely different use, such as office or residential. And even if a handful of properties were to remain permanently vacant, the result would not necessarily be the kind of change to the physical environment that implicates CEQA.

The limited factual observations that Doyle did offer actually cut against her opinions. First, she noted that specific local businesses had recently made substantial physical investments. For example, Sam's Market was "renovating its building inside and out, including new refrigeration and freezer units, expanded fresh food areas, and a new section of the store offering fresh coffee and other beverages, and hot food-to-go. The project included improvements to the parking lot, too, including resurfacing, new protective curbs, and striping . . . ." This seems inconsistent with a conclusion that Sam's Market was operating so close to the margin that competition would drive it out of business.

Second, Doyle observed that residents of Joshua Tree could already shop at chain stores some four or five miles away in Yucca Valley, including a Stater Brothers, a Walmart, and a Walgreen's. This suggests that the businesses in Joshua Tree had already proved able to withstand competition from national chains. In addition, as Dynamic points out, this suggests that local residents are "underserved," resulting in "leaked demand." If so, then "the proposed Project could . . . retain revenue within Joshua Tree that would otherwise leak outside the community."

19

Finally, as already noted, "we must give the lead agency the benefit of the doubt on any legitimate, disputed issues of credibility.  [Citation.]"  (*Citizens for Responsible Equitable Environmental Development v. City of Chula Vista*, *supra*, 197 Cal.App.4th at pp. 330-331.)  Here, at a minimum, there were legitimate issues regarding the credibility of Doyle's opinions.  Hence, the County could deem them not substantial evidence.

We therefore conclude that the trial court erred by ruling that the County improperly adopted a negative declaration.

IV

DISCLOSURE REGARDING DOLLAR GENERAL

The Alliance contends that the County violated CEQA by attempting to hide the fact that the intended occupant of the Project was Dollar General.

A.  *Additional Factual and Procedural Background*.

Dynamic's permit application described the proposed project as a "[g]eneral [r]etail [b]uilding (Dollar General)."  It stated:  "Dollar General is a small-box value retailer that stands for convenience, quality brands and low prices.  With over 9,600 locations in 35 states throughout the United States, we are a Fortune 500 company, with a NYSE ticker symbol ('DG').  Our wide selection of merchandise ranges from convenience foods such as milk, eggs and soft drinks to laundry detergent, paper products

and health & beauty items to socks, underwear and clothing apparel. Roughly a fourth of [its] merchandise sells for a dollar or less."**4**

In a notice to nearby property owners, which invited them to comment, the County described the Project as "minor use permit to establish a 9100 sq. ft. retail store (Dollar General) on 1.45 acres." (Capitalization altered.) Many of the comments that the County received in response referred specifically to Dollar General.

As already mentioned, Dollar General representatives made a presentation at a community meeting.

The revised initial study described the Project only as a "general retail store" rather than as a Dollar General store. However, it attached an appendix entitled "Dollar General Store Project." It also included diagrams of the "Proposed Dollar General Building" (capitalization altered) and reports entitled "Proposed Dollar General." Once again, most commenters referred to the fact that the intended occupant was Dollar General.

A few commenters — even though they themselves mentioned Dollar General — nevertheless complained that the intended occupant had not been disclosed.

The County responded: "The applicant informed County staff that no specific tenant or end user had been identified for the building. Thus, the Initial Study did not

---

**4** Thus, Dollar General is not literally a "dollar store," at which every item costs a dollar or less.

21

identify any prospective tenants or end users as that would have been speculative on the part of County staff.

"Tenant-specific review of a project is not required under CEQA.  As stated by the court in *Maintain Our Desert Environment v. Town of Apple Valley* (4th Dist. 2004) [124] Cal.App.4th [430] at 444:  'So long as the project is approved, CEQA has no concern about who uses it.  If CEQA compliance required the identification of the project end user, a new EIR would need to be considered every time property was sold or a different tenant moved into a building, regardless of the use to which the property was to be put.  In addition to the problems listed above, such a requirement also violates the standard of efficiency required by CEQA.'  This principal [*sic*] is based on the premise that land use approvals run with the land and do not belong to the end-user.  [Citations.] Here, the county reviewed all potential environmental impacts that could occur from a 9,100 square foot general retail user, which would not significantly differ based on the identity of the tenant."  (Italics altered.)

B.      *The Trial Court's Ruling*.

The trial court ruled:  "[The Alliance] does not demonstrate that a Dollar General presents different environmental impacts from the usual general retail store.  The description of the store as a general retail store is not demonstrated to be inadequate and sufficiently discloses the type of retailer envisioned."

22

C.  *Discussion.*

The Alliance does not claim that the County succeeded in hiding the identity of the intended occupant — only that it attempted to do so.  Indeed, the Alliance concedes that there was "considerable evidence about the identity of the intended tenant of the retail store."  Under CEQA, unlike under the criminal law, there is no doctrine of attempt.  Even assuming that the County had to disclose the fact that Dollar General was the intended occupant, it did so adequately.

Separately and alternatively, we agree with the trial court that the County did not have to disclose this fact.

A lead agency that is preparing either an EIR or a negative declaration must give public notice (Pub. Resources Code, § 21092, subd. (a)), which must include "a brief description of the proposed project . . . ."  (*Id*., subd. (b)(1).)  In *Maintain Our Desert Environment v. Town of Apple Valley*, *supra*, 124 Cal.App.4th 430, we held that this does not require disclosure of the end user of the project:  "The key word here is 'brief.' . . . [I]n choosing to use that word, the Legislature suggested that the project description contained in the public notice need not be as extensive as the description in the EIR itself, but need only be a brief, compact summary without elaboration or detail.  We cannot presume that it intended that the project description do more than necessary to fulfill the purpose of the statute.  Ultimately, that aim is to alert the public of a project's purpose and location so that interested persons may further review and comment upon its potential environmental impacts, if they so desire.  It is not necessary then, to effectuate

23

the purpose of the statute that the phrase 'brief description of the proposed project' be defined to require disclosure of the end user of the project.  We may not read into a statute more than what the Legislature has plainly stated therein.  [Citation.]" (*Id*. at pp. 441-442.)

We also held that the EIR itself did not have to identify the end user.  (*Maintain Our Desert Environment v. Town of Apple Valley*, *supra*, 124 Cal.App.4th at pp. 443-449.)  We considered but rejected various arguments as to why the failure to identify the end user supposedly "implicate[d] potential physical environmental impacts." (*Id*. at p. 444; see also *id*. at pp. 444-449.)  Thus, arguably, we left the door open to the possibility that, in some future case, the identity of the end user *would* have to be disclosed, because it *was* "environmentally relevant."  (See *id*. at p. 448.)  This, however, is not that hypothetical case.  Dollar General is a general retailer.  The Project was described as a general retail store.

The Alliance argues that "the identity of the tenant was [relevant] to the County's environmental review of the Project" because "a large national chain store such as Dollar General simply did not fit the unique character of Joshua Tree."  However, this was not an environmental effect within the bailiwick of CEQA.  Rather, it was a matter of taste or preference best addressed through the political process.  The Alliance does not suggest any reason why occupancy by Dollar General would cause adverse environmental impacts above and beyond occupancy by any other general retailer.

Finally, the Alliance argues that the identity of the tenant was relevant to whether the Project was consistent with the Community Plan. However, as we will discuss in more detail in part V.C, *post*, inconsistency with the Community Plan is not, in itself, a violation of CEQA. Accordingly, CEQA did not require disclosure of the identity of the tenant.

In sum, then we conclude that the negative declaration was not undermined by any failure to identify Dollar General.

V

CONSISTENCY WITH THE COMMUNITY PLAN

The Alliance contends that the trial court erred by ruling that the Project was consistent with the Community Plan.

A.  *Additional Factual and Procedural Background*.

The Community Plan was part of the County's general plan. It identified broad "[g]oals" in areas such as land use ("LU") and economic development ("ED"); each goal was associated with a number of more specific "[p]olicies."

In this appeal, the Alliance asserts that the Project was inconsistent with the following goals and policies:

Goal JT/ED 1:  "Preserve and protect Joshua Tree's unique and evolving community atmosphere, artistic base and natural surroundings while providing jobs and improving its tax base."

Policy JT/ED 1.3:  "Encourage and support small independent businesses."

Policy JT/ED 1.4: "Support commercial development that is of a size and scale that complements the natural setting, is compatible with surrounding development and enhances the rural character by incorporating natural desert landscape elements."

Goal JT/ED 4: "Commercial uses and commercial zoning districts within the community shall be of small scale as needed to provide goods and services to residents and travelers, and shall not be of regional scale."

Policy JT/ED 4.1: "Commercial development shall be compatible with the rural environment, and shall protect the quality of residential living."

When the Planning Commission approved the CUP, it found that:

"The [P]roject, as proposed, is designed to be consistent with the goals of the Joshua Tree Community Plan. Specifically, the Project meets the following goals:

"Goal JT/LU 2: Support development of the existing downtown area of Joshua Tree as a focal point and core activity center within the community.

"Goal JT/LU 3: Enhance commercial development within the plan area that is compatible in type and scale with the rural desert character, is located appropriately, and meets the needs of local residents and visitors."

B.     *The Trial Court's Ruling*.

The trial court ruled that the Alliance had not shown that the Project was inconsistent with the Community Plan: "[F]air argument is not the standard. [The Alliance] must demonstrate a finding of consistency is not supported by substantial evidence in light of the whole record. To carry its burden it is not sufficient for [the

26

Alliance] to cite only to opposing comments. [The Alliance] was required to demonstrate that based on all relevant evidence, a finding of consistency could not reasonably be made. [Citation.] [¶] Given the deficiencies in [the Alliance]'s argument, the court denies the writ petition based on inconsistency with the . . . Community Plan."

C.    *The County Properly Found That the Project Was Not Inconsistent with the Community Plan.*

"Each county is required to adopt a 'comprehensive, long-term general plan for . . . [its] physical development . . . .' [Citation.] The plan must include, inter alia, a statement of policies and nine specified elements: land use, circulation, housing, conservation, open-space, seismic safety, noise, scenic highway, and safety. [Citation.]" (*Resource Defense Fund v. County of Santa Cruz* (1982) 133 Cal.App.3d 800, 806.)

We may assume, without deciding, that state law prohibits the County from issuing a CUP for a project unless the project is consistent with the general plan. (Compare *Neighborhood Action Group v. County of Calaveras* (1984) 156 Cal.App.3d 1176, 1184-1186 [state-law consistency requirement applies to use permit] with *Hawkins v. County of Marin* (1976) 54 Cal.App.3d 586, 594-595 [issuance of use permit does not require consistency review].) Even if not, under the County's own Development Code, before issuing a CUP, it must find that "[t]he proposed use and manner of development are consistent with the goals, maps, policies, and standards of the General Plan and any applicable community or specific plan." (San Bernardino County Code (2007) § 85.06.040(a)(4), p. 5-27.)

27

"'[S]tate law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that the proposed project be "*compatible* with the objectives, policies, general land uses, and programs specified in" the applicable plan. [Citation.] The courts have interpreted this provision as requiring that a project be "'in agreement or harmony with'" the terms of the applicable plan, not in rigid conformity with every detail thereof. [Citation.]' [Citation.]" (*Save Our Heritage Organisation v. City of San Diego* (2015) 237 Cal.App.4th 163, 185-186.)

Preliminarily, we must determine the applicable standard of review. The Alliance claims that "[a] Project's inconsistencies with local plans and policies constitute significant impacts under CEQA." Thus, it contends that we should treat this as a CEQA issue and review it under the fair argument standard — i.e., if a fair argument can be made that the Project is inconsistent with the Community Plan, then the County erred by adopting a negative declaration and must prepare an EIR.

In support of its claim that the fair argument standard applies, the Alliance cites *Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903. However, as the leading CEQA treatise states, *Pocket Protectors* stands for the proposition that "[e]vidence that a project is inconsistent with *land use standards adopted to mitigate environmental impacts* can support a fair argument that a project might have a significant adverse effect." (1 Kostka & Zischke, *supra*, § 6.56, p. 6-60.1, italics added.) "The

28

decision in *Pocket Protectors* should not be interpreted to hold that *any* claim of inconsistency with an applicable land use plan or policy requires an environmental impact report.  In *Pocket Protectors*, several factors in combination were important in the court's holding that there was a fair argument of significant impact based on the land use consistency issues.  These factors included (1) that the governing land use standards were adopted in part for the purpose of mitigating environmental impacts, and (2) that the project proposed an entirely different type of housing than was originally envisioned in the development of the land use standards." (*Ibid*., italics added.)

Here, the goals and policies on which the Alliance relies were not adopted to mitigate environmental impacts.  Rather, they are economic development goals, adopted to preserve the small-town, rural atmosphere that residents of Joshua Tree prefer.  Any inconsistency between the Project and these aspects of the Community Plan simply does not implicate CEQA.

The Alliance also cites *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777.  However, that case merely held that a county's approval of a proposed project (which consisted of two area plans and an amendment to a specific plan, *id*. at p. 781) was invalid because the project was inconsistent with the applicable general plan.  (*Id*. at pp. 782-791.)  It did not hold that the inconsistency violated CEQA.  (See *ibid*.)  Moreover, it did not apply the fair argument standard of review.  (See *id*. at p. 782.)

Finally, the Alliance points out that an EIR must "discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans." (Guidelines, § 15125(d).) However, there is no provision that any such inconsistencies necessarily constitute significant environmental impacts. Moreover, here, the County adopted a negative declaration, not an EIR; there is no similar requirement that applies to a negative declaration.

Accordingly, we do not apply the CEQA fair argument standard of review. Rather, we apply the usual standard that applies to a claim of inconsistency with a land use plan: "'[A] governing body's conclusion that a particular project is consistent with the relevant general plan carries a strong presumption of regularity that can be overcome only by a showing of abuse of discretion.' [Citations.] 'An abuse of discretion is established only if the [governing body] has not proceeded in a manner required by law, its decision is not supported by findings, or the findings are not supported by substantial evidence. [Citation.] We may neither substitute our view for that of the [governing body], nor reweigh conflicting evidence presented to that body. [Citation.]' [Citation.] This review is highly deferential to the local agency, 'recognizing that "the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity. [Citations.] Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's

30

purposes. [Citations.] A reviewing court's role 'is simply to decide whether the [local] officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" [Citation.]' [Citation.]" (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816-817.)

"[I]t is important to keep in mind the deferential nature of our review. It is not for us to substitute our judgment for that of a local agency in making a determination of consistency; rather, the agency's determination 'comes to this court with a strong presumption of regularity.' [Citation.] 'Once a general plan is in place, it is the province of elected [agency] officials to examine the specifics of a proposed project to determine whether it would be "in harmony" with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions.' [Citation.] Thus, as long as the [local agency] reasonably could have made a determination of consistency, [its] decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 638.)

"We review the agency's decision regarding consistency with the general plan 'directly, and are not bound by the trial court's conclusions. [Citations.]' [Citation.] 'A [local agency]'s findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no reasonable person could have reached the same conclusion. [Citation.]' [Citation.] Thus, the party challenging a [local agency]'s determination of general plan consistency has the burden to show why, based

on all of the evidence in the record, the determination was unreasonable.  [Citation.]"
(*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)

In applying these standards, "the nature of the policy and the nature of the inconsistency are critical factors to consider."  (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1341.)  A "clear" inconsistency with even a single "fundamental, mandatory and specific land use policy" may be "enough to scuttle a project."  (*Id.* at pp. 1341-1342.)  By contrast, a local agency has "'some discretion'" when it comes to a relatively "amorphous" policy (such as a policy of "'encourag[ing]' development 'sensitive to natural land forms, and the natural and built environment.'  [Citation.]").  (*Id.* at p. 1341.)

The Alliance argues that the Project is inconsistent with Policy JT/ED 1.3 ("[e]ncourage and support small independent businesses") and Policy JT/ED 1.4 ("[s]upport commercial development that is of a size and scale that . . . is compatible with surrounding development") because it competes with and may harm established local businesses.  As we held in part III.D.2, however, there was not even sufficient evidence to support a fair argument that the Project would put local competitors out of business. The mere fact that the Project may compete with established local businesses does not make it inconsistent with the Community Plan.  The Community Plan establishes a policy of encouraging and supporting small independent businesses; it does not require the County to reject all businesses that are not both small and independent.  "Encourage" and "support" are precisely the sort of amorphous policy terms that give a local agency some

32

discretion.  (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors*, *supra*, 62 Cal.App.4th at p. 1341.)

The Alliance also argues that the Project is inconsistent with these policies because, at 9,100 square feet, it would be roughly twice the size of the next largest business in Joshua Tree.  Again, however, the Community Plan did not require the County to reject any business that would be larger than existing businesses.  Significantly, Policy JT/LU 3.6 was to "[d]iscourage regional commercial facilities within Joshua Tree.  To avoid 'big box' commercial developments that are out of character with the rural desert community . . . ."  The Project was not a "regional" commercial facility; there were comparable businesses nearby, in Yucca Valley and Twentynine Palms.  Moreover, it was not a "big box" store, which, the record shows, is commonly defined as at least 50,000 square feet.  Thus, it was not the type of business that the Community Plan affirmatively discouraged.

In determining consistency with the Community Plan, the County could look at the relative size of the building, rather than its absolute square footage.  The County's applicable development standards allowed a building to occupy up to 80 percent of its net lot area; the Project would occupy only 14 percent.  The same standards allowed a floor area ratio of 0.5 to 1; the Project would have a floor area ratio of 0.14 to 1.  It had larger setbacks than it was required to have.  Thus, the County could reasonably view the Project as not out of scale in light of standards implementing the Community Plan.

The Project was also consistent with Goal JT/ED 4, which provided that "[c]ommercial uses . . . shall be of small scale as needed to provide goods and services to residents and travelers, and shall not be of a regional scale," because, as just mentioned, it was not a regional store. The County could properly conclude that it was no larger than it needed to be to provide goods to residents and travelers.

Finally, the Alliance argues that the Project is inconsistent with Policy JT/ED 4.1, which provided, "Commercial development shall be compatible with the rural environment, and shall protect the quality of residential living." However, it does not cite any evidence that required a finding of inconsistency with this policy. Its claim seems to be based on the fact that this particular commercial development would be operated by a large, out-of-town corporation, rather than by locals. Nevertheless, the building was designed so as "to complement the surrounding community and structures with a rural, western 'Mining Town' theme . . . ." There was evidence that it did not significantly block any scenic views. One could view the Project as "protect[ing] the quality of residential living" by providing an additional source of useful goods. The County could reasonably conclude that the Project was not inconsistent with this policy.

# VI

## DISPOSITION

The judgment is reversed.  The trial court is directed to enter a new judgment denying the mandate petition.  Dynamic and the County are awarded costs on appeal against the Alliance.

RAMIREZ _____

P. J.

We concur:

HOLLENHORST _____

J.

CODRINGTON _____

J.

Filed 7/13/16

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| JOSHUA TREE DOWNTOWN BUSINESS ALLIANCE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>COUNTY OF SAN BERNARDINO,<br><br>    Defendant and Respondent;<br><br>DYNAMIC DEVELOPMENT, LLC,<br><br>    Real Party in Interest and Appellant. | E062479<br><br>(Super.Ct.No. CIVDS1307794)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

      As requests have been made to this court pursuant to California Rules of Court, rule 8.1120(a) for publication of the nonpublished opinion filed in this matter on June 15, 2016, and as it appears that parts of the opinion meet the standard for publication specified in California Rules of Court, rule 8.1105(c), IT IS HEREBY ORDERED that the opinion is certified for publication with the exception of part IV.

RAMIREZ          <br>
P. J.

We concur:

HOLLENHORST      <br>
          J.<br>
CODRINGTON       <br>
          J.