Filed 1/4/18; Certified for Publication 1/30/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VISALIA RETAIL, LP, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CITY OF VISALIA, <br><br> Defendant and Respondent. | F074118 <br><br> (Tulare Super. Ct. No. VCU258614) <br><br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Bret D. Hillman, Judge.

Shore McKinley & Conger, Brett S. Jolley and Aaron S. McKinney for Plaintiff and Appellant.

Herr Pedersen & Berglund, Leonard C. Herr and Ron Statler for Defendant and Respondent.

-ooOoo-

This appeal involves a challenge to an update of the City of Visalia's (Visalia) general plan.  Included in the update is a land use policy affecting areas designated "Neighborhood Commercial."  Under the policy, no tenant in a Neighborhood Commercial area may be larger than 40,000 square feet in size.

Appellant claims Visalia violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; "CEQA") by failing to analyze the potential for the land use policy to cause a phenomenon called urban decay. "CEQA does not define urban decay" but some have defined it as "visible symptoms of physical deterioration that invite vandalism, loitering, and graffiti that is caused by a downward spiral of business closures and multiple long term vacancies." (*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 685 (*Joshua Tree*).)

Appellant, likely prompted by concerns as to how the general plan update would adversely impact property it owns, challenged the proposed land use policy. Appellant submitted to Visalia the opinion of an experienced local commercial real estate agent that the land use policy would cause anchor vacancies and/or lower-traffic anchors, which would reduce rental income landlords use for maintenance and improvements, which would "creat[e] a downward spiral of physical deterioration."

The propriety of the tenant size cap was discussed by city staff and councilmembers at various points in the process of drafting and approving the general plan update. However, the environmental impact report (EIR) itself did not analyze the potential for urban decay. Appellant contends this rendered the EIR fatally flawed. We disagree.

CEQA is concerned with significant effects on the environment (§ 21100, subd. (b)), not with purely economic impacts. (see Cal. Code Regs., tit. 14, § 15382)[1] The fact that a policy may hurt certain businesses is not an effect covered by CEQA, unless that impact on business causes a significant effect on the environment. (See *Joshua Tree*, *supra*, 1 Cal.App.5th at p. 685, quoting *South Orange County Wastewater Authority v. City of Dana Point* (2011) 196 Cal.App.4th 1604, 1614 (*Dana Point*).) Here,

---

[1] The Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.) will hereinafter be referred to as the "Guidelines."

appellant failed to produce sufficient evidence from which a fair argument can be made that the land use policy at issue may cause a significant effect on the *environment*, rather than purely economic effects.

As explained below, appellant's expert supported his opinion largely with conjecture as to whether the land use policy would cause urban decay. Moreover, even if the land use policy would undoubtedly cause some adverse economic consequences, appellant's expert offered little to show that "the *magnitude* of this effect" (*Joshua Tree*, *supra*, 1 Cal.App.5th at p. 691, original italics) may lead to a substantial impact on the environment. That is, "even if a handful of properties were to remain permanently vacant, the result would not necessarily be the kind of change the physical environment that implicates CEQA." (*Ibid.*)

We also reject appellant's claims that the amended general plan is internally inconsistent and that Visalia violated a notice requirement of the Planning and Zoning Law (Gov. Code, § 65000 et seq.) We affirm the judgment.

## FACTS

Every city in California must adopt "a comprehensive, long-term general plan for the physical development of the … city …." (Gov. Code, § 65300.) "A general plan provides a " 'charter for future development' " and sets forth a city or county's fundamental policy decisions about such development. [Citation.]" (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 228 Cal.App.4th 1239, 1247.) The general plan may be amended in the public interest. (Gov. Code, § 65358.)

In April 2010, Visalia filed a "Notice of Preparation" (see Guidelines, § 15082) indicating it was preparing to update its general plan, and that an EIR was required. Though specific proposals on how to update the general plan had "not yet been determined," the general plan update would "likely address" various topics including land use and city design.

3.

The notice identified a "next step" in the process, which would involve a group called the General Plan Update Review Committee (GPURC). The GPURC would participate in the development of potential "land use and transportation alternatives" and prepare a "Preferred Plan." The Preferred Plan would be presented to Visalia's "decision-makers," and the general plan update would be drafted based on the Preferred Plan.

On January 22, 2013, the Visalia City Council met with the planning commission to review the progress made by the GPURC. City council members and planning commissioners "provided preliminary feedback to staff for additional analysis." Staff prepared "white papers" addressing various decision points raised by the councilmembers' feedback.

One of the white papers concerned the land use policy applicable to properties classified as "Neighborhood Commercial." The white paper referenced a draft land use policy called LU-P-66,[2] which read in pertinent part:

"Shopping centers in Neighborhood Commercial areas should have the following:

- Anchored by a grocery store or similar business offering fresh produce, poultry, fish and meat;
- Include smaller in-line stores of less than 10,000 square feet;
- Total size of 5 to 12 acres as shown on the Land Use Diagram; and
- Integrated with surrounding neighborhood uses in terms of design, with negative impacts minimized.

"Standards for Neighborhood Commercial development also should require design measures that create a walkable environment and require local street and pedestrian connections. Alterations and additions in existing nonconforming centers may be permitted, subject to design review and conditions of approval to minimize neighborhood impacts." (Italics omitted.)"

---

[2] The policy was later renumbered to LU-P-67.

The staff white paper identified concerns raised with respect to the draft of LU-P-66. Residents of the Stonebridge neighborhood had expressed that there should be "a size limit for anchor stores (i.e., maximum of 35,000 SF)." The residents argued that "grocery stores over 50,000 SF are not truly serving just the surrounding neighborhood, but will target shoppers from outlying areas, thereby creating additional traffic, noise, and other impacts and inviting persons from outside the immediate neighborhood."[3]

The white paper indicates the GPURC "considered" a size limit on grocery stores, but rejected the idea, concluding "the free market will dictate the size of grocery store that will work for a given site and neighborhood. Further, placing a limit on building size could work against continually evolving changes in industry trends and store prototypes."

Visalia staff also provided their own commentary on the size cap issue. They observed that maximum size limits for anchor stores "are somewhat arbitrary." "A typical Savemart grocery store is about 55,000 square feet," but a "new Walmart neighborhood grocery store being constructed at Houston and Demaree is about 38,000

---

[3] Another concern identified in the white paper was raised by Thomason Development Company (Thomason). Thomason owned a 15.5-acre property located at Lovers Lane and Walnut. At the time, the property was designated Neighborhood Commercial, but the proposed general plan update would have redesignated the north 6.2 acres of the property as Medium Density Residential. Thomason testified that a development project on the site was "still active" and that the entire site should remain designated as Neighborhood Commercial. But if the north portion of the site was going to be redesignated, Thomason preferred a Commercial Mixed Use designation over a Medium Density Residential designation.

The white paper indicated that the GPURC "carefully considered land use designation options for the 15.5-acre property and ultimately chose to recommend a mix of Neighborhood Commercial (south 9.3 acres) and Medium Density Residential (north 6.2 acres)." The GPURC reaffirmed its decision at an August 30, 2012, meeting and the planning commission concurred at a September 24, 2012, work session. The planning commission "also suggested possibly considering a Neighborhood Commercial/Mixed Use Commercial split, which some Stonebridge residents expressed opposition to."

The appellate briefs indicate that appellant Visalia Retail, LP also owns the property. The precise relationship between Visalia Retail, LP and Thomason is unclear.

5.

square feet." Visalia staff further observed that store sizes "are dependent on market dynamics" and setting a limit "may create difficulties for grocery stores to locate in Visalia or for [Neighborhood Commercial] sites to attract an anchor tenant."

The white paper recommended that the city council adopt LU-P-66 in its current form. The white paper offered two alternatives to the current draft, one of which was to "establish a maximum (and/or minimum) square footage size requirement for anchor tenants…."

*City Council Work Session on February 25, 2013*

The City Council held a work session on February 25, 2013. Councilmembers discussed various issues. It was Visalia's staff's "understanding from the discussion among the Councilmembers" that they wanted to "set a maximum anchor tenant size of 40,000 sq. ft…." Consequently, staff recommended the following pertinent changes to LU-P-66:

> "Shopping centers in Neighborhood Commercial areas ~~should~~ shall have the following:
>
> - Anchored by a grocery store or similar business offering fresh produce, poultry, fish and meat;
> - Include smaller in-line stores of less than 10,000 square feet;
> - Total size of 5 to 12 acres as shown on the Land Use Diagram; and
> - Integrated with surrounding neighborhood uses in terms of design, with negative impacts minimized.
> - Located no closer than one mile from other General Plan-designated Neighborhood Commercial or Community Commercial locations, or from existing grocery stores.
> - No individual tenant shall be larger than 40,000 square feet in size.
>
> "Standards for Neighborhood Commercial development also ~~should~~ shall require design measures that create a walkable environment and require local street and pedestrian connections. Alterations and additions in existing

6.

nonconforming centers may be permitted, subject to design review and conditions of approval to minimize neighborhood impacts."[4]

The city council adopted the recommended language on April 1, 2013.

*Draft General Plan Update and Draft EIR*

Visalia had urban and regional planning consultants prepare a "public review draft" of the general plan update, and a draft EIR, both dated March 2014. The draft general plan update referred to the land use policy at issue in this case as "LU-P-67" rather than LU-P-66. The policy included the 40,000 square-foot cap on tenants.

The draft EIR was circulated for review and comment from March 31 through May 14, 2014. A "final" EIR was prepared on June 26, 2014.

*Appellant's Written Objection Letter Dated October 6, 2014*

Appellant's counsel sent a letter dated October 6, 2014,[5] to the mayor and city council. The letter was sent on behalf of his clients, "Thomason Development Company/Visalia Retail, LP." The letter expressed objection "to the proposed certification of the Final Environmental Impact Report ('FEIR'), the proposed re-designation of nearly seven acres of Thomason's property as Medium Density Residential along with the proposed overly-restrictive Land Use Policy, LU-P-67, found in the 2030 General Plan Update that will not only limit economic activity in the City of Visalia, but will lead to the urban decay and other physical effects in Visalia."

*Anderson Report*

Enclosed with appellant's counsel's October 6, 2014, letter was a report written by Thomas Anderson, a real estate broker ("the report"). The report first described Anderson's experience and qualifications, which included: (1) cofounding a real estate brokerage firm in 1981; (2) having been "involved in retail shopping center leasing and

---

[4] This is how LU-P-67 reads in the final, adopted general plan update, except that the word "characteristics" was added after "following" in the first sentence.

[5] The letter indicated that it would be hand delivered.

7.

development since 1978"; (3) having "been instrumental in the construction of over 65 shopping centers … comprising over 6,000,000 square feet"; (4) having been "involved in 45 grocery store transactions"; (5) having "completed 25 drug store deals with Payless Drug, CVS Pharmacy, Thrifty and Save On."

The report opined that the 40,000 square-foot cap "creates the strong likelihood that [neighborhood commercial] centers will never develop in Visalia." It also noted that even with his extensive experience with grocery store anchors, he is "unaware of any grocers willing to build new stores under 40,000 sq. ft. in size." The report asserted that a "typical Save Mart, Safeway/Vons, Albertsons, or Lucky supermarket demands at least 50,000 square feet for a new store to 'pencil out' financially." (Fn. omitted.)

The report also cited news articles indicating that the 2009 launch of 10,000 to 20,000 square-foot "Fresh & Easy" stores by "UK mega-grocer Tesco[]" failed and left some landlords "high and dry."

The report indicated that neighborhood supermarket anchors smaller than 40,000 square feet have been unable to maintain long-term, successful operations in Visalia. It cited three examples of stores in the area that were no longer in operation. In contrast, the report identified two Save Marts exceeding 50,000 square feet that "are serving the neighborhoods with close and convenient shopping as planned."

The report also cited the Urban Land Institute as saying, "The neighborhood shopping center provides merchandise for daily living needs – convenience goods like food, drugs, hardware, and personal services. A supermarket is the principal tenant in this type of shopping center." (Emphasis omitted.) The report then opined:

> "The reason for the inclusion of supermarkets in these centers is not difficult to fathom: Supermarkets are the primary draw for the center, and the visitation that they generate is essential for the success of all the tenants. If supermarkets are replaced by low volume tenants such as discount furniture operations that draw few patrons to the center, great harm may accrue to the other tenants, with downward pressure on sales volumes, occupancy and tenant quality."

8.

The report said that the size cap would not encourage grocers to build small stores but would instead cause them to decline to enter the Visalia market entirely. The report acknowledged that it was possible to attract one of a limited number of 40,000 square-foot Walmart neighborhood market anchors, but said that Walmart was unique, and "the more likely scenario will be the absence of any development of new neighborhood retail."

The report said physical effects could result from urban decay.

"In the context of a neighborhood center, there are few acceptable alternatives to [the] presence of the supermarket anchor. Therefore, even if some space can be re-tenanted by other (weaker) tenants, the center may be subject to physical deterioration, urban decay, and blight.

"In addition to physical impacts resulting from failing to provide neighborhood retail needs, these vacancies also, in several situations, would lead to or exacerbate physical blight and 'urban decay' deterioration of the centers resulting from anchor vacancies or by backfilling vacant anchor space with less-utilized commercial uses such as gyms, furniture stores, or '99 cent' stores. Sometimes anchor grocery stores would continue to operate but would seek rent reductions from their landlords. Such reduced revenue stream, in turn, reduced the landlords' available capital [to] maintain and improve these properties, creating a downward spiral of physical deterioration."

The report also briefly opined on the "downzoning" of 6.2 acres of the Thomason property, leaving only 9.3 acres zoned as Neighborhood Commercial. It said that even without the tenant size cap, 9.3 acres is too "compact" of a site to attract anchor tenants.

Finally, the report said the tenant type and size requirements were inconsistent with another part of the proposed general plan update called LU-P-45, which provided:

"Promote development of vacant, underdeveloped, and/or redevelopable land within the City limits where urban services are available and adopt a bonus/incentive program to promote and facilitate infill development in order to reduce the need for annexation and conversion of primary agricultural land and achieve the objectives of compact development established in this General Plan.

9.

"Techniques to be used include designation of infill opportunity zones as part of the implementation process and provision of incentives, such as reduced parking and streamlined review, and residential density bonuses, and floor area bonuses for mixed use and/or higher-density development, subject to design criteria and findings of community benefit. (italics removed)."

The report asserted the tenant type and size requirements would discourage infill and were therefore inconsistent with LU-P-45.

*Adopted General Plan Update*

On October 14, 2014, the city council certified a final EIR for the general plan update. At the same meeting, the city council adopted the general plan update subject to a few amendments passed at the meeting. The final, adopted general plan update retained the 40,000 square-foot cap on tenants.

*Litigation*

On November 14, 2014, appellant filed a petition for writ of mandate in superior court seeking to invalidate Visalia's certification of the final EIR and adoption of the general plan update. The petition asserted that Visalia had failed to comply with CEQA, that the general plan update was inconsistent, and that Visalia failed to properly notice its October 14, 2014, meeting. The superior court rejected each claim, and entered judgment denying appellant's petition on May 9, 2016.

**DISCUSSION**

I.     APPELLANT FAILED TO PRESENT SUBSTANTIAL EVIDENCE FROM WHICH A FAIR ARGUMENT COULD BE MADE THAT THERE IS A REASONABLE POSSIBILITY PHYSICAL URBAN DECAY WILL RESULT FROM LU-P-67

A.     Law

"With certain limited exceptions, a public agency must prepare an EIR whenever substantial evidence supports a fair argument that a proposed project 'may have a significant effect on the environment.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123.)

10.

"An [EIR] is an informational document which … shall be considered by every public agency prior to its approval or disapproval of a project. The purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.)

"The function CEQA assigns to an EIR, in fact, epitomizes the statute's focus on informed decisionmaking and self-government. The statute does not necessarily call for disapproval of a project having a significant environmental impact, nor does it require selection of the alternative 'most protective of the environmental status quo.' [Citation.] Instead, when 'economic, social, or other conditions' make alternatives and mitigation measures 'infeasible,' a project may be approved despite its significant environmental effects if the lead agency adopts a statement of overriding considerations and finds the benefits of the project outweigh the potential environmental damage. [Citations.]" (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 383.)

An EIR must set forth in detail "[a]ll significant effects on the environment of the proposed project." (Pub. Resources Code, § 21100, subd. (b).) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the *physical* conditions within the area affected by the project …." (Guidelines, § 15382, italics added.) Because of the physicality requirement, "[a]n economic or social change *by itself* shall not be considered a significant effect on the environment." (*Ibid.*, italics added.) As a result, "[e]vidence of economic and social impacts that do not contribute to … physical changes in the environment is not substantial evidence that the project may have a significant effect on the environment." (Guidelines, § 15064, subd. (f)(6).) But "[w]here a *physical* change is caused by economic or social effects of a project, the

11.

*physical* change may be regarded as a significant effect in the same manner as any other physical change resulting from the project." (Guidelines, § 15064, subd. (e), italics added.)

As these aspects of the law demonstrate, "CEQA is not a weapon to be deployed against all possible development ills." (*Joshua Tree*, *supra*, 1 Cal.App.5th at p. 685.) The fact that a project "may drive smaller retailers out of business is not an effect covered by CEQA. [Citation.] Only if the loss of business affects the physical environment – for example, by causing or increasing urban decay – will CEQA be engaged. [Citations.]" [Citation.]" (*Ibid.*)

"[I]n preparing an EIR, the agency must consider and resolve *every fair argument* that can be made about the possible significant environmental effects of a project …." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109, italics added (*Protect the Historic Amador Waterways*).) An EIR is required " 'not only when a proposed project *will* have a significant environmental effect, but also when it "may"….' [Citation.]" (*Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424, 432.) "The word "may" in this context connotes a reasonable possibility. [Citations.]" (*Citizen Action to Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748, 753.)

While appellant need only present a "fair" argument, the argument must nonetheless be based on substantial evidence. "[S]ubstantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (Pub. Resources Code, § 21080, subd. (e)(1).) Speculation, argument, unsubstantiated opinion or narrative and evidence of economic impacts are not substantial evidence. (Pub. Resources Code, § 21080, subd. (e)(2).) "Complaints, fears, and suspicions about a project's potential environmental impact likewise do not constitute substantial evidence. [Citations.]" [Citation.]" (*Joshua Tree*, *supra*, 1 Cal.App.5th at p. 690.)

12.

B.       Issue on Appeal

Appellant argues that evidence in the administrative record establishes that the tenant type restriction and size cap will cause significant physical impacts and, therefore, the EIR was inadequate for failing to address those impacts.  Visalia responds that the Anderson report "fails to show how LU-P-67" will cause urban decay.[6]

Synthesizing the parties' contentions and the applicable law summarized above, we can distill the issue before us to the following:  can it be fairly argued from substantial evidence that there is a reasonable possibility LU-P-67 will cause urban decay in the form of significant, physical effect(s) on the environment?

Anderson's urban decay argument can be roughly summarized as follows:  the 40,000 square-foot cap will cause grocers to refuse to locate in neighborhood commercial centers, which will cause vacancies, which in turn will result in urban decay.  Visalia counters that Anderson did not offer legally sufficient evidence that LU-P-67 will cause anchor tenants to refuse to locate in neighborhood commercial centers.

As explained below, we conclude that while the Anderson report presents an earnest policy case against LU-P-67[7], it fails to provide substantial evidence from which

---

[6] Visalia also argues that "even if" appellant had successfully raised a fair argument LU-P-67 would cause urban decay, the city "had substantial evidence upon which to base its decision."  But that is not the applicable standard. If appellant had raised a fair argument of urban decay based on substantial evidence, the EIR would have been required to analyze it.  (See *Protect the Historic Amador Waterways*, *supra*, 116 Cal.App.4th at p. 1109 ["in preparing an EIR, the agency must consider and resolve every fair argument that can be made about the possible significant environmental effects of a project …"].)

[7] We note that the report was offered not only to identify purported CEQA issues, but also to present a broader policy case against the tenant size cap.  While we conclude the report was not sufficient to require CEQA review of urban decay, we express no opinion on the merits of its policy case against LU-P-67.  The issue before us "is not the wisdom of the policies adopted by the public agencies, but whether they complied with CEQA …."  (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1030.)

13.

a fair argument can be made that LU-P-67 may cause significant effects on the environment.

C.    Analysis

The Anderson report offers four bases for the argument that grocers will indeed refuse to locate in neighborhood commercial centers as a result of LU-P-67: (1) Anderson is personally unaware of any grocers willing to build new stores under 40,000 square feet; (2) a "typical" SaveMart, Safeway/Vons, Albertsons or Lucky store requires at least 50,000 square feet to be profitable; (3) Tesco launched multiple 10,000-20,000 square foot grocery stores and they were unsuccessful; and (4) three Visalia grocery stores under 40,000 square feet are no longer in business.

As explained below, none of these constitute "substantial evidence" (Pub. Resources Code, § 21080, subd. (e)(2)) on which a fair argument of urban decay can be predicated.

Anderson's assertion that he is personally unaware of any grocery stores willing to build new stores under 40,000 square feet does not support an argument that *no* grocers are willing to build such stores. Indeed, it is clear that at least some grocers in some circumstances are willing to build stores under 40,000 square feet. For one, Anderson acknowledges that Walmart built a sub-40,000 square-foot supermarket (though he argues Walmart would likely build larger stores in the future). Additionally, the report indicates that some community members were advocating the 40,000 square-foot cap in the hopes of attracting a Trader Joe's or Whole Foods market.[8]

The report also identified four grocers whose business model requires their "typical" stores to be at least 50,000 square feet. But this observation pertains to four

---

[8] As noted in another report offered by appellant in superior court, Trader Joe's has smaller stores compared to traditional grocery stores. That report also indicated that "[a]ccording to the Food Marketing Institute (FMI) the median size of a supermarket in the U.S. in 2013 was 46,500 sq. ft."

grocers, which does not suggest that other grocers are similarly unwilling to build stores under 40,000 square feet. Nor does it establish that even the four identified grocers could not build "atypical" stores to achieve profitability at smaller sizes.

In sum, the report's evidence that *some* grocers would not locate in Visalia, is not enough to support a fair argument "that urban decay would result." (*Joshua Tree*, *supra*, 1 Cal.App.5th at p. 691.) "[E]ven if a handful of properties were to remain permanently vacant, the result would not necessarily be the kind of change to the physical environment that implicates CEQA." (*Ibid.*) Inferring that urban decay would result from the incompatibility between LU-P-67, and the business model of four grocers would be speculation.

The report also points to one grocer's failed attempts to build stores 10,000 to 20,000 square feet in size across the United States. But these stores were one-quarter to one-half the size permitted under LU-P-67. Even if this case study indisputably showed that grocery stores under 20,000 square feet are not viable, it would not raise a fair argument that a size cap twice as large would produce similar results.

Finally, the report identifies three "sub-40,000 sq. ft. neighborhood supermarket anchors" that were "unable to maintain long-term successful operations" in Visalia. But there was no analysis provided as to why those stores closed. Absent such evidence, it is speculation to conclude that they closed because of their size.

In sum, the report does not provide the requisite basis for appellant's challenge because (1) its analysis of causation was speculative, and (2) the potential economic consequences it identifies does not "mean that urban decay would result. Common sense alone tells us nothing about the *magnitude* of th[e] effect.…" (*Joshua Tree*, *supra*, 1 Cal.App.5th at p. 691, original italics.) While the report suggest that some grocers would refuse to locate in Visalia under LU-P-67, it fails to support the implication that such vacancies and lower quality tenants would be so rampant as to cause urban decay. That omission is important, because "even if a handful of properties were to remain

15.

permanently vacant, the result would not necessarily be the kind of change to the physical environment that implicates CEQA." (*Ibid*.)

1. *Bakersfield Citizens for Local Control v. City of Bakersfield* Does not Mandate a Different Result

Appellant points to our decision in *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 (*BCLC*). That case involved the development of two shopping centers totaling 1.1 million square feet of space. The two centers were 3.6 miles apart and *each* center was to have "a Wal-Mart Supercenter … plus a mix of large anchor stores, smaller retailers, and a gas station." (*Id*. at p. 1193.) In contrast, the present case involves a land use policy within an amended general plan.

In *BCLC*, this court held that the EIR in that case was fatally defective for failing to analyze "the projects' individual and cumulative potential to indirectly cause urban/suburban decay…." (*BCLC*, *supra*, 124 Cal.App.4th at p. 1193.) We observed that case law "has established that in appropriate circumstances CEQA requires urban decay or deterioration to be considered as an indirect environmental effect of a proposed project." (*Id*. at p. 1205.) We held that while the proposal of a new shopping center does not trigger "a conclusive presumption of urban decay," analysis of urban decay is required "*when there is evidence* suggesting that the economic and social effects caused by the proposed shopping center ultimately could result in urban decay or deterioration …." (*Id.* at p. 1207, italics added.) We acknowledged cases like *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810 (*City of Pasadena*), disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576, fn. 6, wherein the court "agreed that social and economic effects must be considered if they will cause physical changes," but nonetheless rejected the CEQA challenge presented therein because appellant had not made a sufficient showing that the project would cause physical deterioration. (*BCLC*, *supra*, 124 Cal.App.4th at p. 1206.) For the reasons explained above, we find the present record

16.

closer to *City of Pasadena* than *BCLC* because appellant has not made a sufficient showing LU-P-67 may cause physical deterioration.

In dictum[9] in *BCLC*, we rejected the appellant's argument that study of urban decay was "not required because the record does not contain substantial evidence proving that the shopping centers will cause urban decay." (*BCLC*, *supra*, 124 Cal.App.4th at p. 1207.) We stated that appellant had articulated the "wrong standard of review" and that the true issue was "whether the lead agency failed to proceed as required by law." (*Id.* at pp. 1207–1208.)

*BCLC* was correct that the appellant in that case had identified the wrong standard of review. It is not a project challenger's responsibility to adduce substantial evidence *proving* that the project will cause urban decay. But it *is* the project challenger's responsibility to adduce *substantial* evidence supporting a fair argument that the project *may* cause urban decay. (E.g., *Joshua Tree*, *supra*, 1 Cal.App.5th at pp. 690–692; cf. Pub. Resources Code, § 21082.2.)

II.    THE GENERAL PLAN IS NOT INTERNALLY INCONSISTENT

Appellant contends the general plan is internally inconsistent.

A.    Law

General plans "must be internally consistent." (*Orange Citizens for Parks & Recreation v. Superior Court* (2016) 2 Cal.5th 141, 153.) Similarly, amendments to the general plan must be internally consistent and cannot cause the general plan to become internally inconsistent. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 796, fn. 12.)

" 'The … amendment of a general plan is a legislative act. [Citation.] A legislative act is presumed valid, and a city need not make explicit findings to support its action. [Citations.] A court cannot inquire into the wisdom of a legislative act or review

---

[9] Though we discussed the standard of review, we ultimately concluded that "[i]n any event, [appellant's] position has no substantive merit." (*BCLC*, *supra*, 124 Cal.App.4th at p. 1208.)

17.

the merits of a local government's policy decisions. [Citation.]' " (*Dana Point*, *supra*, 196 Cal.App.4th at p. 1619.) " 'A court therefore cannot disturb a general plan based on violation of the internal consistency and correlation requirements unless, based on the evidence before the city council, a reasonable person could not conclude that the plan is internally consistent or correlative. [Citation.]' [Citation.]" (*Ibid*.) Appellant bears the burden of proof on this issue. (See *ibid*.)

B.       Issue on Appeal

Appellant points to several policies and goals enunciated in the general plan, including: 1) maintaining the city's role as a regional commercial and industrial center for surrounding counties; 2) enhancing the city's retail base; 3) preserving and enhancing qualities that make the city an ideal place to do business; 4) fostering a good working relationship between the city and business community; 5) striving for a balanced mix of local, regional, and national retailers; 6) attracting new retail development; 7) supporting infill development which in turn offers various fiscal, social, economic and environmental benefits; 8) promoting pedestrian-oriented retail.[10] With respect to infill, the general plan contains policies concerning the minimization of urban sprawl, and the encouragement of compact, concentric and contiguous development. Appellant argues LU-P-67 conflicts with these goals and policies because it will prohibit development in neighborhood commercial sites, some of which are surrounded by urbanized development. Appellant points to the Anderson report and city staff analysis as evidence that the rigidity of LU-P-67's tenant size cap is unwise.

---

[10] Appellant also suggests LU-P-67 is inconsistent with the general plan's stated "vision" which "reflects a general desire to increase flexibility for developers in new growth areas." But increasing flexibility for developers is one of several interests expressed in the general plan. The general plan is not obligated to pursue that goal to the exclusion of all others. Otherwise, the general plan could not impose *any* restrictions on developers such as basic zoning and land use regulations.

18.

C.     Analysis

Appellant's argument fails to appreciate the standard of review we must apply, and, more broadly, our role in this process. Determining the proper means of encouraging infill development or market flexibility is a policy question for political bodies, not a legal question for the courts. Our role is to determine whether any reasonable person could conclude that LU-P-67 is consistent with the stated goals of the general plan (e.g., infill development, market flexibility). We conclude that a reasonable person could find the plan internally consistent on several rationales.

First, Visalia could have concluded that the tenant size cap would not impede infill development. The general plan proposed 14 undeveloped neighborhood commercial centers. The general plan also utilized a Commercial Mixed Use designation at which larger tenants *are* permitted. The general plan observes that the "new Commercial Mixed Use designation, applied to much of South Mooney Boulevard north of Caldwell, as well as along other major arterials and community shopping nodes, provides needed flexibility in retail and service formats and clustering." Visalia could have reasonably concluded that LU-P-67 would not likely impede infill development because larger tenants could utilize areas designated commercial mixed use, while smaller tenants could fill the 14 anticipated neighborhood commercial sites. Because that determination is reasonable, it is immaterial that the Anderson report supports a different view.

Second, promoting infill development in whatever form it may take is not the general plan's goal. The general plan seeks specific *kinds* of development (e.g., pedestrian-friendly retail). Once the general plan declares of goal of encouraging infill development, it is not prohibited from seeking to restrict the *nature* of that development, even if those restrictions may preclude some infill development. Here, LU-P-67 caps tenants in neighborhood commercial zones at 40,000 square feet. Even assuming for the sake of argument that appellant is indisputably correct this policy will discourage some infill development, the city may reasonably decide to accept that consequence as the cost

19.

of pursuing *other* goals (e.g., helping smaller businesses, promoting pedestrian-oriented retail, etc.).  In sum, just because the general plan declares a goal of promoting infill development does not mean *all* of its policies must encourage *all* types of infill development.  General plans must balance various interests, and the fact that one stated goal must yield to another does not mean the general plan is fatally inconsistent.  Few, if any, general plans would survive such a standard.

As demonstrated by the two rationales described above, a reasonable person could conclude LU-P-67 is not inconsistent with the stated goals and policies of the general plan.  As a result, we reject appellant's internal inconsistency challenge.  (See *Dana Point*, *supra*, 196 Cal.App.4th at p. 1619 [" 'A court … cannot disturb a general plan based on … internal consistency … unless, based on the evidence before the city council, a reasonable person could not conclude that the plan is internally consistent …' "].)

III.   VISALIA DID NOT VIOLATE THE PLANNING AND ZONING LAW BY FAILING TO PROVIDE 10 DAYS' NOTICE OF THE OCTOBER 14 MEETING

A.   Background Information

On August 27, 2014, Visalia gave notice in a newspaper of general circulation that it would hold a public hearing on the certification of the EIR and adoption of the amended general plan on September 8, 2014.  At the end of the September 8 meeting, Visalia adjourned its meeting to October 6.

On October 6, 2014, the city council of Visalia held a special meeting "to continue the Public Hearing [from September 8] and take additional public comment."  Appellant's counsel offered public comments at the meeting, wherein he expressed concerns with LU-P-67 (and the rezoning of a portion of the Thomason property).  Councilmember Bob Link was absent from the meeting.

Near the end of the meeting, the following discussion occurred:

20.

"MAYOR NELSON: Anybody else like to address the Council at this time? Seeing none, I'm going to close the public comment session. And rest assured again, all of the comments made tonight are public record, Council member Link will be apprised of all the comments made tonight so he will be informed of this session. I will –

"MR. PELTZER: Just to clarify, we want to formally close the public hearing and indicate it won't be reopened at the next hearing.

"MAYOR NELSON: Right we're formally closing the public hearing portion, it will not be reopened at our future meeting …."

At the close of the meeting, a councilmember made a motion "that we continue this item sans public comment because that public hearing was closed, and to a future date to be determined and with notice being more than 24 as is usual with a special meeting." The motion passed.[11]

On October 10, 2014, appellant's counsel engaged Dr. Phillip G. King, an economics professor with a Ph.D. from Cornell University to "prepare an expert analysis of the economic and physical effects likely to result from Visalia's proposal to regulate neighborhood retail center development via General Plan policy LU-P-67." Appellant's counsel later informed Dr. King that on October 10, 2014, Visalia had posted notice of the continued hearing on the general plan for October 14, 2014. Appellant's counsel said he believed Visalia had "erred by not providing 10-days' notice" and would request Visalia reschedule the hearing to provide 10 days' notice.

Nonetheless, the city council held its special meeting on October 14, 2014. The council invited and heard public comment at the October 14, 2014, meeting. Appellant's counsel offered comments, and referenced a letter he had previously sent to the council

---

[11] In a footnote in its opening brief, appellant questions the council's ability to continue a hearing due to a councilmember's absence without allowing public comment. Appellant observes that the absence of a single councilmember deprives attendees the opportunity to engage with every member of the decision-making body. But appellant cites to no authority that every member of a city council must be present at the public hearing mandated by Government Code section 65090.

raising "noticing issues" with the meeting. Appellant's counsel also provided the city council with specific changes it could make to the wording of LU-P-67. After discussion, the city council voted to retain the existing language of LU-P-67, effectively rejecting appellant's counsel's suggestions.

Despite the adoption of the general plan update at the October 14 meeting, Dr. King proceeded to prepare a draft of his expert report in November 2014. The draft report is included in the appellate record.[12] Dr. King described the draft report in a declaration as "essentially the report I would have submitted to the Council had the Council provided 10-days' notice of the final hearing." In the draft report, Dr. King said it was his "professional opinion that Visalia's urban decay would increase markedly" as a result of the general plan update.

B.     Discussion

The Planning and Zoning Law (Gov. Code, § 65000 et seq.) governs the adoption and contents of general and specific plans, among other things. (8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 1010.) Among its requirements is Government Code section 65355's directive that "[p]rior to adopting or amending a general plan, the legislative body shall hold at least one public hearing. Notice of the hearing shall be given pursuant to Section 65090." (Gov. Code, § 65355.) Government Code section 65090 requires 10 days' notice. (Gov. Code, § 65090, subd. (a).)

Appellant argues Visalia violated the Planning and Zoning Law by failing to provide at least 10 days' notice for the October 14, 2014, meeting. We disagree.

The Planning and Zoning Law only requires "one public hearing" before amending a general plan. (Gov. Code, § 65355.) Visalia held a public hearing on September 8, 2014, with notice given on August 27. The public hearing was continued to

---

**12** Dr. King's report was not submitted to Visalia before approval of the general plan update and certification of the EIR. As the trial court observed, the report was "not part of the administrative record and thus not considered."

October 6 and then closed at the end of that meeting. Visalia satisfied the Planning and Zoning Law's requirement of holding "at least one public hearing" with 10 days' notice. (Gov. Code, §§ 65355, 65090, subd. (a).)

It is true that Visalia also held a special meeting on October 14, 2014, and did not provide 10 days' notice for that meeting. But Visalia had already satisfied the Planning and Zoning Law's requirement of "at least one" public hearing with 10 days' notice. That Visalia may have held additional meetings on the general plan amendment is inapposite.[13]

Appellant insists that while the city council indicated it was ending the public hearing on October 6, 2014, it in fact invited and heard public comment at the October 14 meeting. This observation does not alter our conclusion. The Planning and Zoning Law required Visalia to hold "at least one public hearing" and to notice "the hearing" pursuant to Government Code section 65090. Visalia complied by holding a public hearing on September 8, with notice published on August 27. Consequently, even though public comment was permitted at the October 14 special meeting, nothing in Government Code section 65355 required 10 days' notice of that meeting. Importantly, Government Code section 65355 does not require notice under Government Code section 65090 for "all hearings" or for "any such hearings." Instead, it requires notice be given pursuant to Government Code section 65090 for "*the* hearing" – meaning the *singular* "public hearing" required by the statute. (Gov. Code, § 65355, italics added.) Consequently, when a local agency holds one public hearing, properly noticed under Government Code

---

[13] Because we conclude Visalia did not violate the Planning and Zoning Law, we need not address prejudice. However, we do note that appellant's counsel appeared and offered substantial comment at both the October 6 and October 14 meetings. Moreover, while appellant claims that its economist's report was not prepared in time for the October 14 meeting because of purportedly insufficient notice, it offers no satisfactory explanation for why it did not have a report ready in time for the October 6 hearing. We are satisfied that appellant was not denied an opportunity to be heard.

23.

section 65090, its obligation under Government Code section 65355 is satisfied. When the local agency holds additional meetings where public comment is permitted, those meetings are not subject to the notice requirements of Government Code section 65090.**14**

Appellant has failed to show Visalia violated the Planning and Zoning Law's notice requirements.

**DISPOSITION**

The judgment is affirmed.


_____

POOCHIGIAN, Acting P.J.

WE CONCUR:


_____

DETJEN, J.


_____

BLACK,† J.

---

**14** Of course, other notice requirements apply to such meetings, apart from Government Code section 65355. (E.g., Gov. Code, § 54956, subd. (a).)

† Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 1/30/18

**<u>CERTIFIED FOR PARTIAL PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VISALIA RETAIL, LP,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CITY OF VISALIA,<br><br>    Defendant and Respondent. | F074118<br><br>(Tulare Super. Ct. No. VCU258614)<br><br>**ORDER** |

It appearing that part of the nonpublished opinion filed in the above entitled matter on January 4, 2018, meets the standards for publication specified in California Rules of Court, rule 8.1105(c), IT IS ORDERED that the opinion be certified for publication in the Official Reports with the exception of part III of the Discussion.

POOCHIGIAN, Acting P.J.

WE CONCUR:

DETJEN, J.

BLACK,[†] J.

---

[†] Judge of the Fresno Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.