Filed 2/2/26  Ventura County Citizens Against Mega Gas v. City of Camarillo CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| VENTURA COUNTY CITIZENS AGAINST MEGA GAS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF CAMARILLO et al.,<br><br>    Defendants and Respondents.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>    Real Party in Interest. | 2d Civ. No. B344843<br>(Super. Ct. No.<br>2024CUWM022213)<br>(Ventura County) |

The City of Camarillo and its city council (collectively, the City) approved Costco Wholesale Corporation's (Costco) application to build a retail store and gasoline fueling station (the project).  Ventura County Citizens Against Mega Gas (VCCAMG)

appeals from the denial of a petition for writ of mandate. It contends the City violated the California Environmental Quality Act (Pub. Resources Code,[1] § 21000 et seq.; CEQA) when it issued a second subsequent mitigated negative declaration (SSMND) instead of an environmental impact report (EIR). It contends the City did not properly consider or mitigate substantial changes in the project and in the surrounding area since approval of prior versions of the project. We affirm.

FACTUAL AND PROCEDURAL HISTORY

In 2007, the City approved development of a commercial center in Camarillo. The project included a maximum building area of 499,000 square feet including multi-tenant retail, restaurant, and office space. It also included 2,411 parking spaces. The City adopted a general plan amendment, zoning amendments, a commercial planned development permit (CPD), conditional use permit (CUP), and a mitigated negative declaration (MND).[2]

Approval of the original project was subject to 224 conditions. Traffic impacts were analyzed and on-site and off-site improvements were required to accommodate traffic associated with the project, including payment of a traffic mitigation fee. Mitigation conditions included a $651,222 payment to the

---

[1] Undesignated statutory references are to the Public Resources Code.

[2] A "mitigated negative declaration" is prepared when the initial study about the project identifies potentially significant effects on the environment, but the applicant agrees to conditions that would avoid the effects or mitigate them to a point that does not have a significant effect on the environment. (§ 21064.5.)

2

transportation demand management fund to reduce emissions of reactive organic compounds (ROC) and nitrogen oxides (NOx). Air quality mitigation conditions included "fugitive dust control measures" during excavation and reduction of air pollution emissions, including limiting truck idling time, alternate fuel for construction equipment if cost effective, and minimizing use of construction equipment and vehicles during smog season.

In 2011, the City approved an addendum to the MND. The site layout was changed to increase the building area for an anchor tenant (Lowe's) to 155,628 square feet and to add a drive-through restaurant. The overall maximum building space remained at 499,000 square feet. The number of parking spaces was reduced to 2,074. Approval was subject to 255 conditions, including continuation of the previous air quality requirements, a traffic mitigation fee, and funds for local transit.

In 2016, the City adopted a subsequent mitigated negative declaration (SMND) reflecting changes in the layout and building elevations. It included a small increase to 157,801 square feet for the anchor tenant. The maximum total building development remained at 499,000 square feet. The mitigation conditions remained the same as the 2011 addendum.

The project as approved in 2007, 2011, and 2016 was not built. But in 2022, Costco applied to modify the project to build a 163,177 square foot retail warehouse and freestanding fuel facility with 16 dispensers (32 fueling positions).

Following a public hearing, the City's planning commission approved the project, including modification of the CPD, approving a CUP, and adopting the SSMND. The SSMND was prepared by Cadence Environmental Consultants (Cadence) and was 3,366 pages long. It analyzes 18 categories of environmental

3

impacts, including air quality, wildfire, energy, transportation, biological resources, hazardous materials, population, and housing.  The planning commission found "there are no environmental impacts that cannot be adequately mitigated." Mitigation conditions in the SSMND included a timetable for implementing each measure and for monitoring compliance.

VCCAMG appealed to the city council.  (§ 21151, subd. (c).) The council held a public hearing and reviewed the project de novo.  A Cadence representative stated the addition of a gas station was "not minor," but an SSMND rather than an EIR was appropriate because the mitigation conditions would reduce environmental impacts to a less than significant level.  He said that if an EIR were prepared, it would add "a few more sections" but would not provide the City with any new information.  The council denied the appeal and adopted the SSMND.

VCCAMG filed a petition for writ of mandate requesting the City order an EIR.  The trial court denied the petition. (§ 21168; Code Civ. Proc., § 1094.5.)[3]

DISCUSSION

VCCAMG contends the City erred in approving Costco's project based on the SSMND rather than an EIR in violation of CEQA.  We are not persuaded.  As discussed below, substantial evidence does not support a fair argument that changed circumstances would produce new significant environmental effects that would not be effectively remediated by the SSMND

---

[3] The court also dismissed VCCAMG's claim for declaratory relief as "not appropriate to review an administrative decision." (*State of California v. Superior Court* (1974) 12 Cal.3d 237, 249.)

4

mitigation conditions. (CEQA Guidelines,[4] § 15162, subd. (a)(1) & (2); *Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2017) 11 Cal.App.5th 596, 607 (*Friends II*).)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) We "independently determin[e] whether the administrative record demonstrates any legal error by the [City] and whether it contains substantial evidence to support the [City's] factual determinations." (*Ibid.*)

VCCAMG has the burden to show substantial evidence that changed circumstances required preparation of an EIR. (*Citizens for a Megaplex-Free Alameda v. City of Alameda* (2007) 149 Cal.App.4th 91, 112.) " 'The event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis. Only changed circumstances . . . are at issue.' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 949 (*Friends I*).) Therefore, here we review only the incremental effects of Costco's project compared to the earlier projects. (*Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 438.)

---

[4] The Natural Resources Agency's CEQA Guidelines are contained in California Code of Regulations, title 14, section 15000 et seq.

5

*Forfeiture*

The City and Costco contend that VCCAMG forfeited challenges regarding wildfire risk, traffic, and biological resources by failing to raise them in the administrative proceedings and/or trial court.  We disagree.  These issues were preserved because they were raised below "by any person" (§ 21177, subd. (a)) and " 'fairly apprise[d] the agency of the substance of the objection so that it ha[d] an opportunity to evaluate and respond to it.' "  (*Arcadians for Environmental Preservation v. City of Arcadia* (2023) 88 Cal.App.5th 418, 431.)

Regarding the risk of wildfires, the City sent a letter to Costco requesting more information regarding several topics, including the risk of fire from the proximity of electric vehicle charging stations to fuel pumps.  Wildfire risk was also raised in the mandamus petition.  Traffic concerns were discussed in a letter from VCCAMG to the City, and in the mandamus petition.  Biological resources, specifically bird populations, were discussed in a letter to the City from the Audubon Society.  VCCAMG also challenged the effect of the project on wildlife and birds in its letter to the City and in the mandamus petition.

But we will not consider contentions raised for the first time in VCCAMG's reply brief, i.e., risks of a fueling station under an airport flight path, ignition/explosion risk of underground fuel tanks, untimely consideration of diesel truck idling, and the adequacy of the 0.25-mile radius for evaluation of air quality effects.  (*In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693.)

*CEQA framework*

A lead agency must prepare an EIR before approving a project "which may have a significant effect on the environment."

6

(§ 21151, subd. (a); *Friends I*, *supra*, 1 Cal.5th at p. 943.) But when "[t]he initial study shows that there is no substantial evidence, in light of the whole record before the agency, that the project may have a significant effect on the environment," an agency shall prepare a "negative declaration" rather than an EIR. (CEQA Guidelines, §§ 15070, subd. (a), 15063, subd. (b)(2), 15371; § 21064.)

But if "the initial study has identified potentially significant effects on the environment," and the applicant agrees to "revisions in the project plans or proposals" that "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur," an agency shall prepare an MND. (§ 21064.5; CEQA Guidelines, § 15070, subd. (b); *Friends II*, *supra*, 11 Cal.App.5th at p. 604.)

*Subsequent changes*

The CEQA Guidelines include a subsequent review provision that applies following adoption of an EIR, a negative declaration, or an MND. (CEQA Guidelines, § 15162; *Friends II*, *supra*, 11 Cal.App.5th at p. 604; see § 21166.) An EIR shall not be prepared unless substantial evidence establishes that "[s]ubstantial changes are proposed in the project [or in the circumstances under which the project is undertaken] which will require major revisions of the previous . . . negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects," or, in some cases, based on new information that "could not have been known with the exercise of reasonable diligence." (CEQA Guidelines, § 15162, subd. (a).)

"An agency that proposes project changes thus must determine whether the previous environmental document retains

7

any relevance in light of the proposed changes and, if so, whether major revisions to the previous environmental document are nevertheless required due to the involvement of new, previously unstudied significant environmental impacts." (*Friends I*, *supra*, 1 Cal.5th at p. 944.) "[W]hether 'the original environmental document' . . . 'retains some informational value' . . . is a 'predominantly factual question.' " (*Friends II*, *supra*, 11 Cal.App.5th at p. 604.) We review this determination for substantial evidence. (*Id.* at p. 605.)

Here, preparation of the SSMND included review of the environmental evaluations in the 2007 MND and 2016 SMND. To determine whether the City properly relied on these prior environmental reviews when adopting the SSMND rather than preparing an EIR, we first determine whether "substantial evidence supports an agency's decision to proceed under CEQA's subsequent review provisions." (*Friends I*, *supra*, 1 Cal.5th at p. 953.) "We expect occasions when a court finds no substantial evidence to support an agency's decision to proceed under CEQA's subsequent review provisions will be rare, and rightly so; 'a court should tread with extraordinary care' before reversing an agency's determination, whether implicit or explicit, that its initial environmental document retains some relevance to the decisionmaking process." (*Ibid.*)

Substantial evidence here supports the City's decision to consider prior environmental reviews because they remained relevant. For example, the City noted that the 2007 MND concluded the project would not have a substantial adverse effect on any sensitive species. The City also relied on the 2016 SMND's conclusion that the project "would not change the location, type, or amount of development originally evaluated"

8

and would have "no new impacts on biological resources." The City reached the same conclusion regarding biological resources for the current application, i.e., the "location, type, or maximum amount of development" remained the same. Comparisons with the 2007 and 2016 reports were also made regarding other topics, including air quality and wildfire risks. Regarding traffic, the SSMND analyzed data regarding average daily trips contained in the 2007 and 2016 reports and updated this information based on the new methodology regarding vehicle miles traveled.

The City also concluded the amount of development was "within the project impact analysis" adopted in 2016. The total maximum building footage did not change and the area for the anchor tenant increased by less than 4 percent. Accordingly, the City carried the prior mitigation conditions forward in the SSMND. Because the 2007 and 2016 environmental reviews analyzed data still relevant to Costco's proposal, substantial evidence supported consideration of those reviews.

*Environmental effects*

Having concluded the City properly considered the prior environmental reviews, we turn to the question of whether an EIR was required after the 2007 MND. VCCAMG contends an EIR was required because a "fair argument" was made regarding new significant environmental effects that were not effectively remediated by the SSMND mitigation conditions. (*Friends II*, *supra*, 11 Cal.App.5th at p. 607.) It contends that such effects were shown regarding building size, addition of a fuel facility, air quality, parking, wildfire risk, energy impacts, traffic, biological resources, urban decay, and cumulative impacts. We conclude that no EIR was required. After implementing mitigation conditions, there is no substantial evidence of changes in the

9

project or in the surrounding community that would create "new significant environmental effects or a substantial increase in the severity of previously identified significant effects." (CEQA Guidelines, § 15162, subd. (a)(1) & (2).)

### 1. Building size

The proposed Costco building is 163,177 square feet, slightly larger than the 157,801 square feet for the proposed anchor tenant in the 2016 SMND. But the total maximum building area for the project remained at 499,000 square feet. The City reasonably concluded that this change did not establish a new or more severe environmental effect. (§ 21166, subd. (a); CEQA Guidelines, § 15162, subd. (a)(1); *Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1318 [shifting location of units within project not significant change]; *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1545 [7 percent increase in developed area not significant].)

### 2. Fuel facility

VCCAMG contends an EIR was required because the former environmental reviews did not include a fueling facility. It claims that adding a fueling facility with 32 fueling positions and underground tanks is a "fundamental" change with "great" environmental impacts. But VCCAMG did not meet its burden to show the addition of a fuel facility created new significant environmental effects or a substantial increase in their severity. (CEQA Guidelines, § 15162, subd. (a)(1).) "Opinions which state 'nothing more than "it is reasonable to assume" that something "potentially . . . may occur" ' do not constitute substantial evidence." (*Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 477.)

VCCAMG also expressed concern that excavation to bury underground fuel tanks would release "fugitive dust" into the air, and the fueling process and vehicle idling would pollute the air. But as discussed below, the SSMND considered these air quality impacts and imposed conditions to mitigate them.

### 3. Air quality

The City's air quality analysis was conducted pursuant to Ventura County Air Pollution Control District (VCAPCD) methodology. The analysis would have been identical for an EIR. The SSMND updated pollution data from the 2007 analysis by including an evaluation of air quality impacts.

The SSMND continued the mitigation conditions of the 2007 MND and 2016 SMND to control fugitive dust during construction including: watering areas to be excavated and excavated material; enclosing, covering, or stabilizing material stockpiles; and daily sweeping of adjacent streets. The City concluded these conditions would reduce the fugitive dust impact to a less than significant level.

The SSMND noted that unlike the previous proposals, the operation of the fueling facility would produce toxic air contaminants (TACs). But they were calculated as below VCAPCD thresholds of significance. The report concluded that carbon monoxide emissions would be less than significant because no intersections near the project were classified as "congested" where carbon monoxide would concentrate. VCCAMG does not cite any contrary evidence.

VCCAMG has not shown that the City failed to consider new residential housing near the project, including senior apartments. The City evaluated "health impacts to off-site receptors, including nearby residential and worker receptor

11

populations" within 0.25 miles of the project, including north of Highway 101. The health risk to nearby residents, including sensitive residents, was calculated as below the VCAPCD significance thresholds. While VCAPCD classifies "retirement homes" as "sensitive receptors," VCCAMG has not shown that this definition would encompass the senior apartments near the project.

The SSMND also concluded that construction of the project would generate more than 25 pounds of ROC and/or NOx. Based on the City's CEQA Guidelines, this would constitute a potentially significant impact. But mitigation conditions, including limiting truck and equipment idling time, alternate fuels for construction equipment, and limiting vehicle and equipment use during smog season, would reduce emissions from heavy-duty construction equipment with the same impact as the 2016 SMND.

Emissions from operating the project were also mitigated by a $651,222 contribution to the transportation demand management fund, "which would mitigate its air quality impacts to a less than significant level." Payments to such funds are a valid mitigation condition. (See *Save our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 139–140 [traffic impact fee].) The contribution amount was calculated using the VCAPCD methodology, i.e., pounds of emissions over the threshold amount for a four-year period, multiplied by the cost per unit of pollutant reduced. VCCAMG has not shown that the amount calculated was not " 'roughly proportional' to the impacts of the project." (CEQA Guidelines, § 15126.4, subd. (a)(4)(B).)

VCAPCD submitted a memorandum that included several

"comments" about the project.  It did not oppose payments to off-site mitigation fund programs.  And it also "recommend[ed]" the City consider "all feasible on-site mitigation."  Among potential on-site measures were "reducing [the] number of fuel pumps or staging area capacity."  But VCAPCD did not dispute the conclusion that the mitigation conditions adopted would reduce the air quality impact to below significant levels.

The City adopted all of VCAPCD's suggestions except reducing the number of fuel pumps and compressed work schedules.  As requested by VCAPCD, the City "consider[ed]" these suggestions.  Costco's traffic expert advised the planning commission that the number of pumps does not directly influence the number of Costco members or their gas consumption, and that experience at other Costco locations showed 32 fueling positions reduced vehicle queues and idling time.  Costco explained that compressed work schedules were not feasible because employees must work onsite.  The City's decision to not implement some of VCAPCD's suggested options does not constitute a "disagreement among expert opinion" that would require preparation of an EIR.  (See CEQA Guidelines, § 15064, subd. (g).)

### 4. Parking

Based on the square footage of the retail uses, a minimum of 788 parking spaces were required.  The current application included 901 parking spaces.  The SSMND found the project consistent with a City policy to provide sufficient on-site parking to discourage parking on residential streets.

VCCAMG contends the trial court "ignored th[e] evidence" that providing extra parking spaces would cause "increased impervious surface, heat island effects, greenhouse gas

13

emissions, and conflicts with State ZEV policy."  We conclude this contention is forfeited because VCCAMG does not direct us to any such evidence in the record and cites only its own public comment letter which does not mention these purported effects.  (Cal. Rules of Court, rule 8.204(a)(1)(C); *L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619–620.)

### 5. *Wildfire risk*

The SSMND noted that the 2007 MND and 2016 SMND did not evaluate wildfire risks as a separate topic, and the state subsequently adopted thresholds of significance for wildfire impacts.  However, the MND and SMND included evaluation of wildfire risks in their discussions of hazardous materials and concluded the project would have no wildfire impact because it was not adjacent to wildlands or located in a fire hazard zone.  Because the current application did "not change the location, type, or maximum amount of development," the SSMND concluded that no new significant wildfire impacts were shown.  The SSMND also carried forward the 2007 and 2016 fire safety measures, i.e., the building plans must incorporate fire department recommendations for fire safety, and the fire department must approve the plans.  No error has been shown.

### 6. *Energy impacts*

CEQA requires "a discussion of the potential energy impacts of proposed projects, with particular emphasis on avoiding or reducing inefficient, wasteful and unnecessary consumption of energy."  (CEQA Guidelines, appen. F, § I; see § 21100, subd. (b)(3); *League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 164–168.)

The City concluded the project did not involve new significant energy impacts.  It reasoned that the construction

equipment and methods would be typical and not unusually energy intensive. It also considered that the project would comply with California's Building Energy Efficiency Standards (Cal. Code Regs., tit. 24, part 6, § 10-101 et seq.) and the California Green Building Standards Code (Cal. Code Regs., tit. 24, part 11, § 101.1 et seq.). The City concluded the project was not wasteful or inefficient, and did not consume unnecessary energy. We conclude there was no error.

One method of conserving energy is "increasing reliance on renewable energy sources," with options including alternate or renewable fuels or energy systems. (CEQA Guidelines, appen. F, §§ I, II, subd. D.4.) The City considered a supplemental energy analysis that quantified the project's energy use during construction and operation, and discussed renewable energy and energy conservation measures. It found the building was designed to accommodate future solar panel installation, and no other on-site renewal energy sources were available.

The SSMND included conditions to reduce emissions, including requiring solar or low-emission water heaters in the commercial buildings, and construction of bus stops and shelters. Conditions in the CPD and CUP included payment of a traffic mitigation fee, measures to reduce equipment pollutant emissions during construction, and a program to reduce mobile emissions.

Costco also agreed "that the project will employ the sustainable design features to reduce energy use described in the Supplemental Energy Analysis . . . including entering into a Retail Power Purchase Agreement (PPA) directly with a clean energy retailer to provide 100 percent clean power." This agreement furthered use of renewable energy sources.

15

In summary, VCCAMG fails to establish new significant environmental effects regarding energy use (CEQA Guidelines, § 15162, subd. (a)(1)), or that the City's analysis of the issue was insufficient.

### 7. Traffic

The SSMND concluded the project "would have different trip generating characteristics than the [previously] approved shopping center uses." It therefore included a memorandum that analyzed daily trip generation and vehicle miles traveled. The City analyzed miles traveled by employees and new Costco members, which was partially offset by the reduction in miles traveled by Camarillo residents who would otherwise drive to existing Costco stores. The SSMND concluded the Costco proposal would result in 4,591 *fewer* daily vehicle miles traveled than the previously approved 2016 project. VCCAMG has not shown that the traffic effects would create "a substantial increase in the severity of previously identified significant effects." (CEQA Guidelines, § 15162, subd. (a)(1).)

Because the traffic associated with the current application was less than that of the previous proposal, it was unnecessary to conduct a traffic survey to analyze whether an additional lane should be added to Las Posas Road over the freeway. The City properly concluded that a survey might be necessary in the future if a proposal were made to develop the western portion of the property. Because no such proposal had been made, and the City did not give advance approval for such a proposal, the City did not improperly approve the Costco project "before fully evaluating its environmental effects." (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 142.)

16

### 8. *Biological resources*

The Ventura Audubon Society expressed concern about the effect of the current application on bird populations and contended a 2004 biological survey was outdated. The SSMND concluded that "no new potential impacts to biological resources were expected for the proposed project" because the project site is not classified as "open space," and ground cover at the site was regularly controlled by goats brought in for that purpose. VCCAMG fails to establish new significant environmental effects. (CEQA Guidelines, § 15162, subd. (a)(1).)

Biologists also conducted an updated assessment of the project in April 2022, which recommended completion of a nesting bird survey before construction. If active nests were found, a buffer zone would be maintained until the nests were no longer active. The conditions of the CPD and CUP require (not just recommend, as VCCAMG contends) performance of a nesting bird survey before construction, reporting the findings to the City, limitation of construction in a buffer zone around any active nests, and weekly monitoring of nests by a qualified biologist compliant with Fish and Game Code section 3503.5 and the Migratory Bird Treaty Act (16 U.S.C. § 703 et seq.). Preconstruction surveys and buffer zones are appropriate mitigation conditions. (*Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 524.) VCCAMG has not shown that these conditions fail to establish a "reporting or monitoring program" or are not "fully enforceable through permit conditions, agreements, or other measures." (§ 21081.6, subds. (a)(1), (b).)

### 9. *Urban decay*

VCCAMG contends the project would result in urban decay.

(*Joshua Tree Downtown Business Alliance v. County of San Bernardino* (2016) 1 Cal.App.5th 677, 685 (*Joshua Tree*).) The only evidence in support of this theory was the public comment of a gas station/convenience store owner stating that the Costco fuel station "could prove devastating to" his business and the livelihoods of his employees. He did not say the project would cause him to close his business. Nor does VCCAMG establish that he made his comment as an "expert" that would constitute a "disagreement among expert opinion" requiring preparation of an EIR. (CEQA Guidelines, § 15064, subd. (g).) The record does not establish that he was a qualified expert, with " 'special knowledge, skill, experience, training, or education . . . on the subject to which his testimony relates' " that is " '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*Tesoro del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 639; Evid. Code, §§ 720, subd. (a), 801, subd. (a).) The statements here were not expert testimony because they " 'consist[ed] of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (*Tesoro del Valle Master Homeowners Assn.*, at p. 639.)

An impact on a competing business does not necessarily constitute urban decay. Economic effects of a project are not treated as significant effects on the environment unless they cause physical changes to the environment. (§ 21080, subd. (e)(2); CEQA Guidelines, §§ 15064, subd. (e), 15131.) The fact that " 'constructing big-box retail stores . . . may drive smaller retailers out of business is not an effect covered by CEQA. [Citation.] Only if the loss of businesses affects the physical environment—for example, by causing or increasing urban

18

decay—will CEQA be engaged.' " (*Joshua Tree, supra*, 1 Cal.App.5th at p. 685.)

VCCAMG has presented no evidence that closing one gas station would have effects such as " 'visible symptoms of physical deterioration that invite vandalism, loitering, and graffiti that is caused by a downward spiral of business closures and multiple long term vacancies[,] . . . plywood-boarded doors and windows, . . . dumping of refuse on site, overturned dumpsters, broken parking barriers, broken glass littering the site, dead trees and shrubbery together with weeds, lack of building maintenance, abandonment of multiple buildings, homeless encampments, and unsightly and dilapidated fencing.' " (*Joshua Tree, supra*, 1 Cal.App.5th at p. 685.)

VCCAMG contends "multiple residents" and "detailed testimony" expressed concerns about such risks. But it has forfeited this claim by failing to provide specific citations to the record to support it. (Cal. Rules of Court, rule 8.204(a)(1)(C); *L.O. v. Kilrain, supra*, 96 Cal.App.5th at pp. 619–620.) Moreover, " '[i]n the absence of a specific factual foundation in the record, dire predictions by nonexperts regarding the consequences of a project do not constitute substantial evidence.' " (*East Sacramento Partnerships for a Livable City v. City of Sacramento* (2016) 5 Cal.App.5th 281, 297.)

*10. Cumulative impacts*

VCCAMG contends the City failed to properly evaluate the "project's potentially significant *exacerbating* effects on existing environmental hazards." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 388 (*California Building Industry Assn.*).) We are not persuaded. A "vague claim of exacerbation, without any factual support, is

19

insufficient. . . . ' "Unsubstantiated opinions, concerns, and suspicions about a project, though sincere and deeply felt, do not rise to the level of substantial evidence." ' " (*East Sacramento Partnerships for a Livable City v. City of Sacramento, supra*, 5 Cal.App.5th at p. 297.)

The SSMND analyzed air quality impacts to nearby residential developments and the area in general.  It concluded that VCAPCD guidelines do not "require an analysis of cumulative impacts with existing facilities," such as Highway 101 or other existing streets and highways.

Here, the air quality impacts from the project do not exacerbate the pollution from Highway 101 any more than pollution from any other source.  Thus, it was unlike the example given in *California Building Industry Assn.* where a project's construction activities could exacerbate an existing hazard by dispersing a hazardous chemical currently dormant in the soil of an abandoned gas station.  (*California Building Industry Assn.*, *supra*, 62 Cal.4th at p. 389.)  Nor has VCCAMG "identified any deficiencies or omissions in [the City's] analysis" or shown that "the project had impacts not contemplated" by the SSMND. (*Covina Residents for Responsible Development v. City of Covina* (2018) 21 Cal.App.5th 712, 731.)

*Adoption of SSMND*

An EIR is required only "if the project modification introduces previously unstudied and potentially significant environmental effects *that cannot be avoided or mitigated* through further revisions to the project plans." (*Friends II*, *supra*, 11 Cal.App.5th at pp. 606–607, italics added.)

Here, the City updated the prior analyses with new data and analysis on topics including air quality, wildfire, energy,

20

traffic, and biological resources. The SSMND adopted by the City was supported by a wealth of statistics, calculations, maps, and studies. In our view, the City properly determined that an SSMND, circulated for public review, was the appropriate vehicle to address changed circumstances because mitigation conditions were sufficient to reduce the new impacts to a less than significant level. (CEQA Guidelines, § 15070, subd. (b).) VCCAMG has not shown a "disagreement among expert opinion" that would require preparation of an EIR. (See CEQA Guidelines, § 15064, subd. (g).) Thus, we conclude VCCAMG failed to establish a "fair argument" (*Friends II*, *supra*, 11 Cal.App.5th at p. 607) that new significant environmental effects were not effectively remediated by the SSMND mitigation conditions.

DISPOSITION

The judgment is affirmed. Respondents and real party shall recover their costs on appeal.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

YEGAN, Acting P. J.          CODY, J.

21

Mark S. Borrell, Judge

Superior Court County of Ventura

_____

Finney Arnold, Tal C. Finney and Shaune B. Arnold for Plaintiff and Appellant.

Burke Williams & Sorensen, Rachel H. Richman, Kevin D. Siegel and Connon T. MacLean for Defendants and Respondents.

Armbruster Goldsmith & Delvac and Damon P. Mamalakis for Real Party in Interest.